IN THE SUPREME COURT OF TENNESSEE

AT JACKSON

FRANK L. WHITE,                    )           FOR PUBLICATION
                                   )           Filed: September 3, 1996
        Plaintiff-Appellant,       )
                                   )
v.                                 )           SHELBY PROBATE
                                   )
HUBERT A. McBRIDE, EXECUTOR        )           Hon. Leonard Pierotti, Judge
                                   )
                                   )
        Defendant-Appellee.        )
                                   )
                                   )
                                   )           No. 02S01-9510-PB-00104

For Plaintiff-Appellant:                       For Defendant-Appellee:

Frank J. Glankler, Jr.                         James T. Bland, Jr.
Robert L. Hutton                               Memphis, Tennessee
Glankler Brown
Memphis, Tennessee


O P I N I O N          FILED

                       September 3, 1996

                       Cecil Crowson, Jr.
                       Appellate Court Clerk


COURT OF APPEALS AFFIRMED IN PART;
REVERSED IN PART.                                        DROWOTA, J.
        This case presents the question of whether the plaintiff, attorney Frank White,

may recover attorney's fees from the estate of Kasper McGrory. This broad question may, in turn, be divided into two specific subissues: (1) whether the contingency fee contract between White and McGrory is "clearly excessive" under Disciplinary Rule 2-106 of the Code of Professional Responsibility, Tenn. Sup. Ct. R. 8, and is, thus, unenforceable; and (2) if the contingency fee contract is unenforceable, whether White may, nevertheless, recover attorney's fees on a quantum meruit basis. For the reasons that follow, we hold that the contract is unenforceable and that White is not entitled to recover under the theory of quantum meruit. Because the probate court and the Court of Appeals held that White could not recover under the contract, but could recover on a quantum meruit basis, we reverse the latter part of the judgment.

## FACTS AND PROCEDURAL HISTORY

A full account of the facts is necessary to put the above-stated issues in perspective; we shall, therefore, set them out in some detail. The plaintiff, Frank White, was a friend and legal representative of Kasper McGrory and his wife Ruby Leigh Anglin McGrory for several years; in the early 1970s, he drafted wills for them in which each left all his or her assets to the surviving spouse. The McGrorys' relationship, however, apparently deteriorated thereafter. In the fall of 1990, while suffering from an illness that would eventually result in her death, Leigh wrote a holographic will in which she left several specific bequests to family members and friends, but made no mention whatsoever of Kasper. This will was placed in her safe, which contained a great many of her assets, including jewelry, deeds to real property in Texas, and numerous stock certificates.

2

During Leigh's illness her brother, Roma Anglin, traveled to Memphis from his home in Texas and, with White's assistance, secured a durable power of attorney for her. On December 17, 1990, just days before Leigh's death, Roma Anglin and Vincent Smith, one of Kasper's nephews, opened Leigh's safe and made a detailed inventory of its contents. After completing the inventory, Roma removed the contents and placed them, pursuant to his power of attorney, in a safe deposit box at a First Tennessee Bank in Memphis. At some point shortly after the inventory was taken, Vincent Smith provided copies of that document to both Kasper McGrory and White.

Leigh died on December 22, 1990; after the funeral, Roma Anglin returned to Texas, taking the holographic will with him. Soon thereafter Kasper expressed a desire to put Leigh's estate in order, and he asked White to assist him. White agreed to help, and he apparently contacted Roma and Leigh's other relatives in Texas to find out if they would be willing to come to Shelby County and have the estate probated there. Evidently, White did not receive a positive response from these Texas relatives, and he advised Kasper to wait and see what would happen. Kasper continued, however, to insist on taking action with regard to the estate. Thus, on February 28, 1991, he and White entered into an agreement in which White was "to force the probate of Leigh McGrory's estate in Shelby County, Tennessee to ascertain assets, 1/3 of which belong to the husband, in order to recover same." For these services White was to be paid a $2,500 retainer plus "one-third of gross recovery above and in excess of retainer."

On March 8, 1991, White filed, in the Shelby County Probate Court, a petition to open Leigh McGrory's estate and to issue letters of administration. The petition

3

stated that the Texas relatives had not shown any willingness to come to Shelby County to probate the estate and that the estate needed to be probated in order to protect Kasper's McGrory's interest therein. Moreover, the petition provided that Kasper had previously attempted to impound the contents of the safe deposit box by means of a detainer warrant issued against First Tennessee Bank; the petition asked the probate court clerk to issue a citation to the bank ordering it to appear and show cause why it had not turned over the contents of the box. Finally, the petition asked the clerk to issue a citation to Roma Anglin ordering him to appear in the probate court and surrender the will.

On March 11, 1991, the probate court entered an order appointing James Allison as administrator of Leigh McGrory's estate. The court also ordered the issuance of the requested citations to First Tennessee Bank and Roma Anglin.

On March 27, 1991, Verda Hogue, Leigh's sister living in Texas, filed a petition in the probate court asking it to (1) admit the will taken from the safe to probate; (2) appoint Verda Hogue executrix of the estate; and (3) revoke the letters of administration previously issued to James Allison. The probate court set the hearing on the petition for April 22, 1991.

At some point before the petition was heard, it came to light that Roma Anglin had not only taken the will from the jurisdiction, but had also removed Leigh's assets from the First Tennessee safe deposit box and taken them to Texas.[1] These assets,

_____

[1]Although the record does not make clear how or when this happened, presumably First Tennessee simply informed the court that there were no contents in the box

4

with the exception of the jewelry, were returned to the probate court; in its April 25, 1991, order denying Verda Hogue's petition to be named executrix, the probate court stated that "an injunction shall issue enjoining all heirs and interested parties from disposition of, or removing from this jurisdiction any personal property belonging to the deceased."

After this initial flurry of activity, the administration of Leigh McGrory's estate languished in the probate court; when Kasper McGrory died on July 22, 1992, no assets had yet been distributed.[2] Kasper left a will in which he bequeathed virtually his entire estate to the Catholic Diocese of Memphis; he also named Hubert McBride as executor of the will. McBride, in turn, hired attorney James Bland to represent Kasper's estate.

In the fall of 1993, James Kleiser, the chief financial officer of the Memphis Diocese, expressed concern about the fact that the administration of Leigh McGrory's estate was not still complete, and that Kasper's estate had received nothing therefrom. After conferring with Bland, Kleiser decided that it would be preferable to

---

to turn over.

[2]The record reveals that relatively little was done with regard to the estate. The only meaningful pleading is White's petition on behalf of Kasper for an elective share on May 31, 1991, and this petition was never acted upon. Furthermore, several essential matters, such as taxation requirements, were not taken care of by the administrator. We can glean several reasons for the delay in administering the estate. First, and of only minor importance, is the fact that Peter Bloom, a beneficiary of certain shares of stock under Leigh's will, claimed that the will had been forged and that he was actually entitled to all the shares of that particular stock. Second, two pieces of real property owned by Leigh were located in Texas, which could have taken some time to properly value and dispose of. Most importantly, however, it appears that the administrator simply had no experience in handling relatively large estates.

relieve White of his representation of Kasper's interest in Leigh's estate. Bland, thus, wrote White a letter on October 27, 1992, informing him of the decision. In this letter, Bland offered to pay White a reasonable fee for his prior representation of Kasper's interest in Leigh's estate.

White refused to accept this proposal, citing his February 28, 1991, contingency fee contract with Kasper. Thereafter, Kasper's estate filed a petition to substitute Bland as counsel and for approval of attorney's fees, which White opposed. On January 25, 1993, the probate court entered an order substituting counsel; it also set a hearing for March 2, 1993, for a determination of a reasonable fee due White.

Before the hearing was held, however, White filed a claim against Kasper's estate for $108,291.00; this figure represented approximately one-third of $349,000, the amount of Leigh's estate to which Kasper was entitled by law. McBride filed an exception to this claim, alleging that the claimed fee was "clearly excessive" under DR 2-106 and was, therefore, unenforceable.

After hearing evidence on these issues, including the testimony of two former probate judges and White's sworn statement as to the amount of time he had expended on the case, the probate court filed a memorandum opinion in January 1994. In this opinion, the probate court held that the fee sought to be charged by White violated DR 2-106. It reasoned as follows:

There is no proof in this record that there was ever any doubt that Mr.

6

McGrory was Ruby Leigh McGrory's surviving spouse and an heir at law, and therefore entitled to, at a minimum, 1/3 of his wife's estate. The record reflects no will contest, no issue raised as to Mr. McGrory being the surviving spouse and no other suit or challenge of any kind in this matter undertaken or defended by Mr. White. Therefore, the only genuine contingency involved was how large a disbursement Mr. McGrory would ultimately receive by operation of law.

[White] in support of his fee request points to the fact that he had to resist the efforts of Mrs. McGrory's relatives to take her assets to Texas. Mr. Allison testified that Mr. White was instrumental in helping him get those assets returned to Memphis. Although Mr. White did help get those assets back, there was never any doubt that these assets belonged to Mrs. McGrory's estate and it was in the power of this court to order them to be returned.

...

[White also] defends his contingent fee contract by claiming that Mr. McGrory was fully advised of the situation when he entered into the subject contract. The fact that an attorney fully informs his client of the contingent fee contract and its implications does not validate it. The court in Florida Bar v. Moriber, 314 So. 2d 145, 149 (Fla. 1975), faced a similar defense and stated 'even if we presume that the client were an educated, experienced party dealing at arm's length with Respondent, it is our view that an attorney may still be disciplined for overreaching when fees charged are grossly disproportionate to the services rendered.' In the instant case even if Mr. White fully explained the contingent fee contract to Mr. McGrory, it does not validate the agreement in this case. It is quite possible that Mr. McGrory did not fully understand the matter and had no idea what other attorneys in the area would charge for similar services to obtain his legal share of his wife's estate, which he would have received by operation of law. The duty must therefore be placed on the attorney to deal fairly and in good faith with his clients in setting fees.

... The court finds and so holds that the fee sought to be charged by [White], under said contract, was grossly disproportionate to the services he rendered. The court further finds that the fee sought by [White] under said agreement was clearly excessive and unreasonable, and the court therefore holds that the subject contingent fee contract was in violation of Disciplinary Rule 2-106(a) and said contract was unenforceable. Therefore, [White] cannot recover under it.

Although it rejected White's claim pursuant to the fee contract, the probate court went on to note that Tennessee law permits a recovery under the theory of

7

quantum meruit even if a fee contract were unenforceable.  Believing that it was required to award a fee based on quantum meruit, the probate court multiplied White's time on the case, approximately 114 hours, by $150 per hour -- a rate established by expert testimony as the maximum allowable for probate matters.[3] After making some minor deductions, the probate court set the fee at $12,500.[4]

White then appealed to the Court of Appeals, which affirmed the judgment. We granted review in this case to decide whether the fee contract violated DR 2-106; and if so, whether White is entitled to recover under the theory of quantum meruit.

## I.

The first issue for our consideration is whether the contingency fee contract itself and the subsequent attempt to enforce that contract contravened DR 2-106. That rule provides:

---

[3] Two former Shelby County probate judges, Joseph Evans and James Watson, testified that $150 per hour was the maximum rate they would award for probate work.

[4] The probate court also considered the reasons for the termination of White's employment, reasoning that if White had been discharged without cause he was entitled to recover under the contract; but if he had been discharged with cause, he was limited to a recovery on a quantum meruit basis.  The court concluded that White had been discharged with cause, and the Court of Appeals affirmed this holding.  However, although the holding is an accurate statement of law and probably correct under the facts, it was, nevertheless, unnecessary for a resolution of this case.  Once the probate court held that the contract violated DR 2-106, White could not recover under that contract, regardless if he had been discharged with cause or not.  Because this holding is not necessary, we will not discuss it here.

(A) A lawyer shall not enter into an agreement for, charge, or attempt to collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
>
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
>
> (3) The fee customarily charged in the locality for similar legal services.
>
> (4) The amount involved and the results obtained.
>
> (5) The time limitations imposed by the client or by the circumstances.
>
> (6) The nature and length of the professional relationship with the client.
>
> (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
>
> (8) Whether the fee is fixed or contingent.

(C) A lawyer shall not enter into an arrangement for, charge, or collect a contingent fee for representing a defendant in a criminal case.

Although these factors are to be used as guides, Connors v. Connors, 594 S.W.2d 672, 676 (Tenn. 1980), ultimately the reasonableness of the fee must depend upon the particular circumstances of the individual case. Hail v. Nashville Trust Co., 31 Tenn. App. 39, 212 S.W.2d 51 (1948).

White begins his argument by pointing out that contingent fee contracts are

9

not explicitly prohibited by DR 2-106 even though they may not be the norm in probate matters. Similarly, he also notes that a fee contract for one-third of a recovery is not, in and of itself, impermissible. Having set forth these propositions, with which we have no quarrel, he proceeds to attack two of the probate court's findings: (1) that the one-third percentage was excessive under the circumstances of the case; (2) and that there was no true contingency in the case. White argues that the one-third percentage was not excessive because, at the time he entered the contract, he had no idea as to the size of Leigh McGrory's estate. This fact is important, he says, because if the estate had turned out to be smaller, a one-third fee would have been proper. As to the second finding, White argues that a contingency was, in fact, present because Leigh's relatives had removed her assets to Texas, and it was unclear whether these assets could be recovered. White concludes that this risk of nonrecovery constituted a contingency, thereby justifying the fee contract.

We find both these arguments unconvincing. With regard to the first point, it is true that at the time White entered the fee contract with Kasper, the value of certain of Leigh's assets -- namely the Texas real estate and the jewelry – was not known, and thus the exact value of her estate was uncertain. However, this fact does not justify the one-third percentage. As mentioned above, White was supplied with an inventory of the contents of Leigh's safe shortly before her death. This inventory reveals that Leigh owned stock in no less than twenty different companies, and it gives the identification numbers of the shares. Therefore, White should have suspected that he was dealing with a sizeable estate; and a cursory investigation of the market prices of the listed stock would have confirmed this fact. Thus, we must reject White's contention that he had absolutely no knowledge of the size of the

10

estate when he entered the fee contract.

With respect to the second point, we agree with the probate court's assessment of the situation: even if the relatives had removed the assets to Texas, Kasper's interest in them was beyond dispute, and it was completely within the power of the probate court to demand that they be returned. While this fact is enough to defeat White's argument, we note that it is flawed in another way. White's argument necessarily presupposes that he was aware, at the time that he entered into the contract, that a risk of nonrecovery was present: in other words, the argument presupposes that White already knew, as of February 28, 1991, that Roma Anglin had taken the assets to Texas and might not return them. The record, however, belies this assertion. In the petition to open Leigh's estate, filed on March 8, 1991, one week after the contract was finalized, White demanded that First Tennessee Bank show cause as to why it had not turned over the contents of the safe deposit box. However, in this same petition White demanded only that Roma Anglin surrender Leigh's holographic will to the court. The inescapable conclusion to be drawn from this situation is that White did not know, at the time the contract was finalized, that Roma had removed the assets from the First Tennessee box and taken them to Texas. Once this fact is made clear, White's argument rings quite hollow indeed.

Having rejected White's proferred justification of the fee contract, we have no doubt that the probate court was correct in holding that the fee contract violated DR 2-106. Although this estate matter was not without problems, it was, in the scheme of things, not terribly complicated or novel. Certainly it did not require any special skill

11

or expertise, DR 2-106(B)(1), and White does not hold himself out as a probate specialist, worthy of an extraordinarily high fee. DR 2-106(B)(7). There is no indication that this matter prohibited White from undertaking other employment. DR 2-106(B)(2). Furthermore, the results obtained by White were not particularly good, DR 2-106(B)(4), as Kasper had received nothing from Leigh's estate as of the date of his death. Finally, and most dramatically, we note that if White were to be paid in accordance with the fee contract, he would have earned approximately $950 per hour. This figure is grossly in excess of the $150 hourly rate, which, judging from the expert testimony, we consider to be at the upper end of "the fee customarily charged in the locality for similar legal services." DR 2-106(B)(3).

Because we agree that the fee sought to be charged was clearly excessive under DR 2-106, we therefore affirm the probate court's holding on this issue.[5]

## II.

The next issue for our consideration is whether White may recover fees on a quantum meruit basis despite the fact that the fee contract is violative of DR 2-106 and, thus, unenforceable. White argues that settled Tennessee law provides that an attorney may recover fees on the theory of quantum meruit even if the fee contract itself is determined to be unenforceable. He cites three cases in support of this proposition: Planter's Bank v. Hornberger, 44 Tenn. (4 Cold.) 531 (1867); Cooper &

---

[5] The Court of Appeals did not address this issue, choosing instead to focus on the issue of whether White was discharged with cause. As we indicated in note 4, however, that issue was unnecessary for a resolution of the case as the probate court had already held that the fee was clearly excessive under DR 2-106.

<u>Keys v. Bell</u>, 127 Tenn. 142, 153 S.W. 844 (1912); and <u>Cummings v. Patterson</u>, 59 Tenn. App. 536, 442 S.W.2d 640 (1968).

The estate, for its part, concedes that Tennessee law does sanction a recovery in <u>quantum meruit</u> even if the fee contract were deemed to be unenforceable.  However, it argues that this rule is flawed and that attorneys who attempt to charge a fee that is clearly excessive under the disciplinary rules of this court should not be permitted to recover on a theory of <u>quantum meruit</u> if that fee is disallowed.  To allow such a practice, the estate contends, encourages unscrupulous attorneys to try and exact unreasonable fees from their clients, confident that they will receive a reasonable amount of compensation if their unethical efforts are thwarted.

Initially, we note that the parties are correct in their assessment of Tennessee case law on this point.  These decisions, however, have been almost entirely devoid of any supporting rationale for the rule.  For example, in <u>Hornberger</u> this Court invalidated an ambiguously worded contract that would have allowed practically unlimited fees to be collected by the attorney.  After a very extensive discussion of the attorney's duty to deal fairly with the client and a vigorous condemnation of the fee contract, which it characterized as "appalling" and "astonishing," <u>Hornberger</u>, 44 Tenn. at 575, the court concluded, without any discussion, that "the recovery of the attorney should be scaled and brought to <u>quantum meruit</u>." <u>Id</u>. at 578.

Similarly, in <u>Cooper & Keys</u> two attorneys attempted to collect a $2,500 fee, pursuant to a vaguely drafted contingency contract, for services rendered to the defendant in the course of divorce litigation.  Noting that the defendant could have

13

had the services of another very reputable attorney for $250, one-tenth of the amount

demanded by the plaintiffs, this Court refused to enforce the contract, reasoning that:

> The relationship of attorney and client is an extremely delicate and fiduciary one, so far as the duty of the attorney toward the client is concerned.  The attorney is an officer of the courts in which he is a practitioner, and courts jealously hold him to the utmost good faith in the discharge of his duty.  This is true where his advice and direction are required in dealings between his client and a third party, and also where the dealing is between the attorney and his client.
>
> ... [W]here an attorney deals with his client for further professional services, and the contract between them is reduced to writing, and the attorney seeks to enforce it, he must show that the client fully understood its meaning and effect, and that each of them understood it in the same sense; otherwise the contract cannot be enforced.  He must also show that his contract is just and reasonable and free from all exorbitancy of demand.
>
> ...
>
> Such a rule tends to prevent, in a measure at least, such unseemly contests as the present suit.  Tested under the above rule, the contract set out in complainants' bill is unenforceable.  It is, upon its face, unreasonable, exorbitant, and improbable.  It calls for a fee out of all proportion to the amount and value of the service rendered ....

Cooper & Keys, 127 Tenn. at 150-51, 153 S.W. at 846-47 (citations omitted.)

However, as in Hornberger, after sharply criticizing the contract and holding

it unenforceable, the court summarily concluded that:

> ... [T]he measure of the complainants' recovery would be the fair and reasonable value of the services rendered by them to the defendant in the divorce suit, not upon the basis of the contingent fee, but upon the basis of an implied agreement to pay a fair and reasonable fee, and the balance due, if any, under this measure of recovery should be ascertained as an issue of fact.

14

Id. at 847.

In fact, the only justification for the rule is to be found in Cummings v. Patterson, where the Court of Appeals considered the validity of a fee contract which included a provision prohibiting the client from settling the case without the attorneys' consent. Although the attorneys admitted that such provisions were void as against public policy, they argued that they did not know that the provision was illegal at the time they drafted the contract and that the settlement provision was severable from the remainder of the contract. The defendant, on the other hand, argued that the attorneys were not entitled to any fee, either under the contract or quantum meruit, under the circumstances. The Court of Appeals rejected both arguments, explaining that:

> It is not material that the attorneys at that time were unaware of this rule of law. On the other hand, we consider it inequitable and unjust to permit the client to profit by an innocent inclusion of this obnoxious provision in the contract. We conclude that the Chancellor rightly refused to enforce the contract and rendered a decree on the basis of quantum meruit.

Cummings, 442 S.W.2d at 643 (emphasis added.)

Therefore, whereas Hornberger and Cooper & Keys contain but a bare statement of the rule, with absolutely no supporting rationale, Cummings relies upon the principle of fairness to support an award of fees on a quantum meruit basis. The Cummings court believed that attorneys should not be deprived of a reasonable fee when their fee contracts, although violative of public policy, had nevertheless been entered into in an innocent manner.

15

The rule fashioned by the <u>Cummings</u> court is, in our view, completely acceptable. We agree that attorneys should not be penalized for innocent snafus, such as an oversight in drafting that might render their fee contracts unenforceable. To do so would be unfair to the lawyer who had otherwise diligently pursued the client's interests, and it would result in a windfall to the client who had benefitted from these services. Thus, a recovery under a theory of <u>quantum meruit</u> is warranted in these situations.

We are of the opinion, however, that an attorney who enters into a fee contract, or attempts to collect a fee, that is clearly excessive under DR 2-106 should not be permitted to take advantage of the <u>Cummings</u> rule. A violation of DR 2-106 is an ethical transgression of a most flagrant sort as it goes directly to the heart of the fiduciary relationship that exists between attorney and client. To permit an attorney to fall back on the theory of <u>quantum meruit</u> when he unsuccessfully fails to collect a clearly excessive fee does absolutely nothing to promote ethical behavior. On the contrary, this interpretation would encourage attorneys to enter exorbitant fee contracts, secure that the safety net of <u>quantum meruit</u> is there in case of a subsequent fall.

We do not agree with White's dire prediction that this holding will have a chilling effect on attorneys' willingness to enter contingent fee contracts. Disciplinary Rule 2-106 is not a weapon that a recalcitrant client can employ at will to nullify the fee contract and thereby escape all liability for legal services. Rather, by its very terms the rule condemns only those fees that a lawyer of ordinary prudence would definitely and firmly believe to be excessive and sets forth a list of factors to

16

determine when a fee is reasonable. Because of the high threshold embodied in the rule, we are confident that DR 2-106 will serve to deny recovery only to those who truly deserve it.

Having so concluded, we reverse that portion of the lower courts' judgment awarding fees on a <u>quantum meruit</u> basis. Any prior authority in conflict with this opinion is hereby expressly overruled.

_____
FRANK F. DROWOTA III
JUSTICE

Concur:

Birch, C. J.
Anderson, Reid, White, JJ.