IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 10, 2000 Session

## McDONNELL DYER, P.L.C. v. SELECT-O-HITS, INC.

**Direct Appeal from the Chancery Court for Shelby County**
**No. 108323-2; The Honorable Floyd Peete, Jr., Chancellor**

---

**No. W2000-00044-COA-R3-CV - Filed April 20, 2001**

---

This is a suit for the recovery of attorney's fees. The Appellee brought a complaint against the Appellant in the Chancery Court of Shelby County, seeking to recover $120,000.00 in attorney's fees. The Appellant filed an answer and counterclaim, seeking to recover $10,000.00 it paid to the Appellee and $10,953.05 it paid in legal fees to another law firm. The Chancery Court of Shelby County found that the $120,000.00 fee was excessive and entered a judgment in favor of the Appellee in the amount of $89,685.00. The trial court dismissed the Appellant's counterclaim. The Appellant appeals from the decision of the Chancery Court of Shelby County granting a reduced amount of attorney's fees to the Appellee and dismissing the Appellant's counterclaim. For the reasons stated herein, we affirm the trial court's decision as modified.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY KIRBY LILLARD, J., joined.

Scott F. May, Memphis, TN; Robert Malouf, Jackson, MS, for Appellant

Glen Reid, Jr., Mark Vorder-Bruegge, Jr., Memphis, TN, for Appellee

### OPINION

### I. Facts and Procedural History

The Appellant, Select-O-Hits, Inc. ("Select-O-Hits") is a Tennessee corporation in the wholesale and retail music distribution business. During the times relevant to the dispute that is the subject of this litigation, Select-O-Hits was owned by Sam Phillips, John Phillips, and Kathy Phillips Gordon ("the Phillips"). The Appellee, McDonnell Dyer, P.L.C. ("McDonnell Dyer") is a former law firm in Memphis, Tennessee, that is now in liquidation.

In the fall of 1994, Select-O-Hits was approached by a competitor, MS Distributors of Chicago, Illinois, concerning a potential purchase of Select-O-Hits and its distribution network. Richard Thomas ("Mr. Thomas"), a personal insurance salesman for the Phillips, advised the Phillips as to the price they should obtain from MS Distributors. The sale to MS Distributors fell through. In March 1995, Mr. Thomas asked the Phillips if they would be interested in selling half of the business of Select-O-Hits for more than they had contemplated selling the entire business to MS Distributors. The Phillips advised Mr. Thomas that they were interested. Mr. Thomas contacted Wesley Grace ("Mr. Grace"), a registered securities representative of Progressive Capital Investment Corporation. Mr. Grace contacted Lee Harkavy ("Mr. Harkavy"), an attorney for McDonnell Dyer, and asked to meet with him regarding a potential private placement transaction.

On March 17, 1995, McDonnell Dyer attorneys Mr. Harkavy, Bob Ratton ("Mr. Ratton"), and Bill Solmson ("Mr. Solmson") met with Mr. Thomas and Mr. Grace to discuss the structure of the transaction. The attorneys claim that Mr. Thomas and Mr. Grace stated that they were meeting with McDonnell Dyer on behalf of the Phillips who did not want to be involved in the initial aspects of structuring the transaction. Select-O-Hits claims that Mr. Thomas was not an agent or employee of Select-O-Hits but was an independent contractor, or promoter, working directly with McDonnell Dyer. On March 27, 1995, Mr. Harkavy opened the file for this matter at McDonnell Dyer but failed to get an engagement letter contrary to instructions in the firm's New Matter Report. McDonnell Dyer attorneys claim that there was no formal policy at the law firm to get engagement letters. McDonnell Dyer never entered into a written fee agreement with Select-O-Hits concerning legal services to be performed in relation to the transaction.

Mr. Harkavy, Mr. Ratton, and Mr. Solmson had a meeting to discuss the amount of legal fees to charge Select-O-Hits. The attorneys claim that they took various factors into consideration in determining the amount to be charged. The Phillips had requested that the transaction be completed in thirty days. The complexity of the transaction was complicated by the Phillips' desire to use Charitable Remainder Unit Trusts to shelter the income the Phillips would receive from the proposed transaction. In addition to the securities and tax work, McDonnell Dyer's intellectual property attorneys would be required to devote considerable time to the project. Taking into consideration all of these factors, the attorneys decided that the fee for legal services would be $120,000.00. Mr. Harkavy claims that he informed Mr. Thomas and Mr. Grace of the $120,000.00 fee. Mr. Harkavy further contends that he advised that Select-O-Hits would need to pay a $10,000.00 retainer before McDonnell Dyer would begin working on the proposal. On April 18, 1995, McDonnell Dyer received a $10,000.00 check from Select-O-Hits. Select-O-Hits denies that the $10,000.00 payment was a retainer but instead terms the payment "seed money" or "earnest money."

On April 24, 1995, McDonnell Dyer attorneys Mr. Harkavy, Mr. Ratton, and Cheryl Patterson ("Ms. Patterson") met with the Phillips, Mr. Thomas, Mr. Grace, and an estate planning attorney, John Parker ("Mr. Parker"), at the Select-O-Hits office. McDonnell Dyer claims that the purpose of the meeting was twofold: (1) to confirm that Select-O-Hits and not Mr. Thomas and Mr. Grace had engaged McDonnell Dyer to perform the transaction; and (2) to confirm that the Phillips understood that the structure for the transaction was complicated. McDonnell Dyer further claims

that its attorneys explained to the Phillips that Select-O-Hits would be primarily obligated to pay the attorney's fees of $120,000.00. If the transaction closed, however, the $120,000.00 fee would be paid for out of the proceeds of the closing. McDonnell Dyer contends that the Phillips, on behalf of Select-O-Hits, approved the fee and authorized McDonnell Dyer to proceed with the transaction. The Phillips state that, on behalf of Select-O-Hits, they committed to be responsible for the legal fee if the transaction did not close; however, they claim that McDonnell Dyer did not inform them of the amount of the fee at the April 24, 1995, meeting. The Phillips contend that based on assurances that the transaction would close, they considered Select-O-Hits' liability, if any, to be merely collateral. Mr. Harkavy claims that he cautioned that there was no guarantee that the transaction would close.

On May 15, 1995, McDonnell Dyer produced the first draft of the Disclosure Statement and forwarded it to Mr. Thomas, Mr. Grace, Mr. Parker, and the Phillips. The Disclosure Statement included a specific reference to a $120,000.00 fee termed "offering expenses." There was no explanation in the Disclosure Statement as to what constituted offering expenses. On May 18, 1995, McDonnell Dyer created SOH Investors, LP, which was the limited partnership that was going to be sold to investors. Additionally, McDonnell Dyer created several new entities related to the transaction in a mass filing on May 17 and 18, 1995. On May 22, 1995, McDonnell Dyer forwarded a second draft of the Disclosure Statement to the interested parties. A footnote contained in the second draft defined the term "offering expenses" as legal fees associated with the offering. Select-O-Hits claims that it did not learn the amount of legal fees that McDonnell Dyer expected to receive until mid May of 1995.

In July, 1995, the Phillips asked Mr. Harkavy who McDonnell Dyer was representing in the transaction. Mr. Harkavy responded, "we are representing the deal." McDonnell Dyer contends that "the deal" consisted of Select-O-Hits and the newly created entities. The Phillips claim that Mr. Harkavy stated that McDonnell Dyer was not representing the Phillips individually or Select-O-Hits. Mr. Harkavy asserts that on numerous occasions he explained to the Phillips that McDonnell Dyer was representing Select-O-Hits and not the Phillips individually. McDonnell Dyer contends that Mr. Parker represented the Phillips individually. The Phillips deny that Mr. Parker was their attorney. After their conversation with Mr. Harkavy, the Phillips retained Sam Chafetz ("Mr. Chafetz"), an attorney with the Waring Cox law firm, to represent them in the transaction. Mr. Chafetz claims that he informed Mr. Harkavy that he was representing Select-O-Hits and the Phillips individually. Mr. Harkavy asserts that Mr. Chafetz was only representing the Phillips individually.

The final draft of the Disclosure Statement was prepared on or about September 19, 1995, and was delivered to Mr. Thomas for marketing. The offering was priced at $4,500,000.00, which constituted fifteen units for sale at $300,000.00 each. Prior to Mr. Chafetz's involvement, fifty-one percent of Select-O-Hits was to be sold to investors. After Mr. Chafetz's involvement, however, forty-nine percent of Select-O-Hits was to be sold. Mr. Chafetz states that it would have been in Select-O-Hits' best interest to offer more units for sale to investors which would lower the offering price per unit. As an explanation for the small number of high priced units, Mr. Chafetz points out that Mr. Thomas was not a licensed broker or dealer. Mr. Chafetz claims that McDonnell Dyer was

attempting to avoid Mr. Thomas being licensed by not offering over fifteen units.[1] Nevertheless, Mr. Chafetz approved the Disclosure Statement and nature of the transaction.

Mr. Thomas was unable to sell a single unit. In early 1996, John Phillips called Mr. Harkavy and informed him that he wished to terminate the offering. Mr. Harkavy notified Mr. Thomas to cease marketing efforts and requested that Mr. Thomas return all of the Disclosure Statements. Mr. Harkavy claims that he reminded John Phillips that Select-O-Hits was responsible for the $120,000.00 fee. Mr. Harkavy contends that John Phillips acknowledged that Select-O-Hits owed the fee. Mr. Harkavy further asserts that he advised John Phillips that the fee could be paid monthly or could be reduced to $80,000.00. Select-O-Hits refused to pay the attorney's fees McDonnell Dyer claimed were due.

On October 8, 1996, McDonnell Dyer filed a complaint on sworn account for money damages in the Chancery Court of Shelby County claiming that Select-O-Hits was indebted to McDonnell Dyer for the sum of $113,475.83, plus interest. On January 3, 1997, Select-O-Hits filed its answer and counterclaim to recover the $10,000.00 Select-O-Hits paid McDonnell Dyer and the $10,953.05 in legal fees Select-O-Hits paid to Mr. Chafetz and the Waring Cox law firm. Select-O-Hits pled several affirmative defenses in its answer including failure to state a claim upon which relief can be granted, statute of frauds, lack of an attorney-client relationship between Select-O-Hits and McDonnell Dyer, unreasonable and excessive fee by McDonnell Dyer, and negligent conduct by McDonnell Dyer. The trial court found that the Phillips knew or should have known that McDonnell Dyer was not representing them personally. The trial court further found that the $120,000.00 fee was excessive. On December 9, 1999, the trial court entered a final judgment in favor of McDonnell Dyer against Select-O-Hits in the amount of $89,685.00 (the time value of the fee based on standard hourly rates).[2] This appeal followed.

## II. Standard of Review

The standard of review for a non-jury case is *de novo* upon the record. See Wright v. City of Knoxville, 898 S.W.2d 177, 181 (Tenn. 1995). There is a presumption of correctness as to the trial court's factual findings, unless the preponderance of the evidence is otherwise. See TENN. R. APP. P. RULE 13(d). For issues of law, the standard of review is *de novo*, with no presumption of correctness. See Ridings v. Ralph M. Parsons Co., 914 S.W.2d 79, 80 (Tenn. 1996).

## III. Law and Analysis

---

[1] A security that is being sold must be registered at the state level; however, there is an exemption to this rule if there are fifteen or fewer purchasers. Mr. Chafetz claims that McDonnell Dyer was attempting to avoid the state registration requirement and the resulting state scrutiny by offering only fifteen units.

[2] On March 21, 2001, the trial court entered a judgment dismissing Select-O-Hits' counterclaim.

Select-O-Hits raises the following issues for our review:

1. Whether the trial court erred by denying the statute of frauds defense raised by Select-O-Hits;

2. Whether the trial court erred by permitting McDonnell Dyer to recover attorney's fees after finding that the $120,000.00 fee was excessive;

3. Whether the trial court erred by impliedly denying the negligence defense raised by Select-O-Hits;

4. Whether the trial court erred by impliedly denying the no meeting of the minds defense raised by Select-O-Hits;

5. Whether the trial court erred by impliedly denying the quantum meruit and unclean hands defenses raised by Select-O-Hits; and

6. Whether the trial court erred by dismissing the counterclaim brought by Select-O-Hits to recover the $10,000.00 payment made to McDonnell Dyer and the $10,953.05 payment in legal fees made to Mr. Chafetz and the Waring Cox law firm.

We will examine each of these issues in turn.

## Statute of Frauds

The first issue presented for our review is whether the trial court erred by denying the statute of frauds defense raised by Select-O-Hits. Select-O-Hits argues that it was secondarily liable for the attorney's fees such that, pursuant to the statute of frauds, the agreement must be in writing and signed by Select-O-Hits in order to be enforceable. Section 29-2-101(a)(2) of the Tennessee Code states:

> (a) No action shall be brought: (2) To charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person; . . . unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party.

TENN. CODE ANN. § 29-2-101(a)(2) (2000).

Whether an oral agreement to pay the debt of another is enforceable under the statute of frauds depends on whether the agreement is original or collateral. In 37 C.J.S. *Statute of Frauds* § 22 (1997) it is said:

> As a general rule, a promise to pay the debt of another if the latter defaults in the payment, or in other words the guaranty of a debt, is collateral and within the statute of frauds; in fact whether the promisor assumes a primary obligation or a secondary one dependent on another's default is often applied as a test to determine whether a promise is original or collateral. However, where the main object of guarantors is not to answer for the debt, default, or miscarriage of another whose debt is guaranteed, but to obtain substantial benefits or advantages to themselves which actually inure to them, their guaranty is also their own original agreement, and no writing is

-5-

essential to its validity under the statute of frauds.

Id.

The evidence is uncontroverted that McDonnell Dyer failed to obtain a written agreement concerning the attorney's fees to be paid by Select-O-Hits. The evidence is further uncontroverted that Select-O-Hits agreed to pay the attorney's fees to McDonnell Dyer. Select-O-Hits argues, however, that its liability was not original but merely collateral in the form of a guarantee because Select-O-Hits was liable for the attorney's fees only if the transaction failed to close. McDonnell Dyer claims that Select-O-Hits agreed to be primarily liable for the attorney's fees; however, if the transaction closed, the attorney's fees would be paid out of the proceeds of the closing.

The agreement made by Select-O-Hits was an original undertaking and outside the statute of frauds. The leading purpose of Select-O-Hits, in agreeing to pay the attorney's fees to McDonnell Dyer if the transaction did not close, was to promote Select-O-Hits' own interest in selling approximately half of its business to potential investors. Because the main object of Select-O-Hits in making the agreement was to gain substantial benefit for itself, we find this agreement to be original in nature and thus outside the scope of section 29-2-101(a)(2) of the Tennessee Code. Accordingly, the trial court did not err by denying the statute of frauds defense raised by Select-O-Hits.

**Excessive Fees**

The second issue presented for our review is whether the trial court erred by permitting McDonnell Dyer to recover attorney's fees after finding that the $120,000.00 fee was excessive. Select-O-Hits cites White v. McBride, 937 S.W.2d 796 (Tenn. 1996), in support of its argument that McDonnell Dyer should not be permitted to recover any attorney's fees because the $120,000.00 fee was "clearly excessive." In White, the Tennessee Supreme Court granted review to determine whether an attorney's fee contract violated Disciplinary Rule 2-106 of the Code of Professional Responsibility ("DR 2-106") and, if so, whether the attorney was entitled to recover on the basis of quantum meruit. See id. at 800. The supreme court first addressed the issue whether the fee contract was in violation of DR 2-106. DR 2-106 states:

> (A) A lawyer shall not enter into an agreement for, charge, or
> collect an illegal or clearly excessive fee.
> (B) A fee is clearly excessive when, after a review of the facts,
> a lawyer of ordinary prudence would be left with a definite and
> firm conviction that the fee is in excess of a reasonable fee. Factors
> to be considered as guides in determining the reasonableness of a
> fee include the following:
> (1) The time and labor required, the novelty and difficulty of the
> questions involved, and the skill requisite to perform the legal
> service properly.
> (2) The likelihood, if apparent to the client, that the acceptance of

the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

CODE OF PROFESSIONAL RESPONSIBILITY DR 2-106 (2000).

In determining whether the fee contract was clearly excessive, the supreme court relied on the factors set out in DR 2-106 but also noted that "[a]lthough these factors are to be used as guides, ultimately the reasonableness of the fee must depend upon the particular circumstances of the individual case." White, 937 S.W.2d at 800. The supreme court affirmed the trial court's holding that the fee sought to be charged was clearly excessive in violation of DR 2-106. See id. at 801. Upon determining that the fee contract was in violation of DR 2-106, the supreme court then addressed the issue whether the attorney could recover a fee under quantum meruit. See id. The supreme court held that an attorney who enters into a fee contract that is clearly excessive in violation of DR 2-106 generally may not recover under quantum meruit. See id. at 803. The court, however, did find that a recovery under quantum meruit is warranted in situations where an attorney makes an innocent mistake that renders the fee contract unenforceable, such as an oversight in drafting. See id.

In the case at bar, the trial court stated that, "the contract fee of $120,000.00 was excessive. Therefore the Defendant owes the Plaintiff $89,685.00 (the time value of the fee based on standard hourly rates)." The trial court never stated that the $120,000.00 fee was *clearly* excessive. We must determine whether there is a distinction between a fee being "excessive" versus a fee being "clearly excessive" in violation of DR 2-106.

Courts in other jurisdictions have labeled attorney's fees as clearly excessive in the following circumstances: (1) where the fee was grossly out of proportion with the fees charged for similar services by other lawyers in the same locale, see In re Brown, 511 N.E.2d 1032, 1033-34 (Ind. 1987); (2) where a lawyer induced a client to pay for unnecessary services, see In re Tobin, 628 N.E.2d 1268, 1270 (Mass. 1994); (3) where a lawyer submitted reconstructed time records in an attempt to collect a fee equal to a disallowed contingent fee, see In re Conduct of Barber, 904 P.2d 620, 629-30 (Or. 1995); (4) where a lawyer solicited a fee for work already paid for, see Attorney Grievance Comm'n v. Korotki, 569 A.2d 1224, 1236 (Md. 1990); (5) where a lawyer attempted to collect a fee exceeding an authorized amount, see People v. Walker, 832 P.2d 935, 936 (Colo. 1992), Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Evans, 537 N.W.2d 783, 785 (Iowa 1995); and (6) where a lawyer attempted to collect a fee that was unexplainedly disproportionate to the amount in

controversy, see Florida Bar v. Mirabole, 498 So. 2d 428, 429 (Fla. 1986), In re Disciplinary Proceedings Against Bult, 469 N.W.2d 653, 654 (Wis. 1991). In each of these cases, the attorneys placed the desire to make money over the importance of the fiduciary relationship existing between attorney and client. We find that the White court was attempting to prevent these types of cases where the fee sought was so far out of relation to the services rendered as to rise to the level of "an ethical transgression of the most flagrant sort." White, 937 S.W.2d at 803. We do not construe White as an attempt to discourage merely high fees. Thus, we find that a fee can be high, even excessive, yet not be clearly excessive, such that an attorney may recover under quantum meruit.

In the case at bar, the $120,000.00 fee was a fixed fee which Ms. Patterson testified was common in securities transactions. McDonnell Dyer attorneys testified that Select-O-Hits presented them with a highly complex securities transaction. The transaction was further complicated by Select-O-Hits' personal tax concerns. Select-O-Hits informed McDonnell Dyer that they wanted the work performed on a fast track of thirty days. The transaction required the work of numerous attorneys and paralegals, including attorneys in the securities, tax, and intellectual property divisions of the law firm. The attorneys and paralegals logged approximately 826 hours of work on the Select-O-Hits transaction. Ms. Patterson testified that McDonnell Dyer attorneys had other matters on which they could have worked on an hourly basis had they not been working on the Select-O-Hits transaction. Mr. Chafetz testified that a reasonable fee for this type of transaction would be between $45,000.00 and $67,000.00. Mr. Chafetz characterized the $120,000.00 fee as being "very much on the high side" of these numbers; however, Mr. Chafetz never characterized the $120,000.00 fee as clearly excessive. Taking into account the factors established in DR 2-106 and the circumstances involved in this particular case, we find that the fees sought by McDonnell Dyer, while high, or excessive, did not rise to the level of being clearly excessive. Accordingly, we find that the trial court did not err in permitting McDonnell Dyer to recover attorney's fees under quantum meruit after finding that the $120,000.00 fee was excessive.

The trial court reduced the $120,000.00 fee to $89,685.00. Tennessee courts have traditionally determined the reasonable value of an attorney's services by considering the number of hours billed and the lawyer's customary hourly rate. See In re Estate of Davis, 719 S.W.2d 526, 529 (Tenn. Ct. App. 1986). McDonnell Dyer attorneys and paralegals logged 826.49 hours of work on the Select-O-Hits transaction. The trial court stated that it computed the $89,685.00 amount by considering the time value of the fee based on standard hourly rates. After finding that the $120,000.00 was excessive, the trial court properly set the attorney's fees at $89,685.00 in accordance with Tennessee law.

**Negligence**

-8-

The third issue presented for our review is whether the trial court erred by impliedly denying the negligence defense raised by Select-O-Hits. Select-O-Hits argues that the transaction was so flawed as to amount to a breach of McDonnell Dyer's duty to Select-O-Hits. In support of its position, Select-O-Hits cites the Tennessee Supreme Court case of Crawford v. Logan, 656 S.W.2d 360 (Tenn. 1983). In Crawford, the supreme court cited with approval several cases holding that malfeasance or breach of faith by an attorney against his client during the performance of services may support a complete forfeiture of fees. See id. at 364 (citations omitted). The supreme court did qualify this general rule, however, by stating that such misconduct by an attorney does not result in an automatic forfeiture of his fees. See id. at 365. Rather, "[e]ach case involving misconduct of an attorney and the forfeiture of his fee must be viewed in the light of the particular facts and circumstances of the case." Id.

The trial court in the case at bar was faced with sharply conflicting testimony from McDonnell Dyer on the one hand and Select-O-Hits on the other. Resolving the conflict in testimony depends in large part upon the trial court's assessment of the credibility of the witnesses who testified in the case. As the trier of fact, the trial court had the opportunity to observe the manner and demeanor of the witnesses as they testified. See Whitaker v. Whitaker, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to a witness's testimony lies in the first instance with the trial court as the trier of fact, and the credibility accorded will be given great weight on appeal. See Mays v. Brighton Bank, 832 S.W.2d 347, 352 (Tenn. Ct. App. 1992); Sisk v. Valley Forge Ins. Co., 640 S.W.2d 844, 849 (Tenn. Ct. App. 1982). On issues which hinge on witness credibility, the trial court "will not be reversed unless, other than the oral testimony of the witnesses, there is found in the record clear and convincing evidence to the contrary." Thompson v. Creswell Indus. Supply, Inc., 936 S.W.2d 955, 957 (Tenn. Ct. App. 1996) (quoting Tennessee Valley Kaolin Corp. v. Perry, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974)).

Select-O-Hits claims that McDonnell Dyer was negligent in its representation of Select-O-Hits because McDonnell Dyer stretched the securities laws and chose a complicated organizational form. Mr. Chafetz testified at trial that McDonnell Dyer attorneys attempted to circumvent the securities laws by offering only fifteen units for sale at $300,000.00 per unit. Mr. Chafetz testified that it would have been in Select-O-Hits' best interest to offer more units for sale at a lower offering price per unit. Ms. Patterson, testified that McDonnell Dyer attorneys did nothing to circumvent the securities laws. McDonnell Dyer notes that Mr. Chafetz approved the Disclosure Statement and the nature of the transaction. Ms. Patterson further testified that Mr. Chafetz was responsible for changing the amount of the business to be sold to investors from fifty-one percent to forty-nine percent which she claimed was not an attractive business proposition. McDonnell Dyer contends that Select-O-Hits' tax concerns drove the complexity of the transaction and that this complexity was not generated by the attorneys at McDonnell Dyer. In impliedly rejecting Select-O-Hits' negligence defense, the trial court apparently found McDonnell Dyer's witnesses to be more credible than the witnesses Select-O-Hits presented. Our review of the record, taking into account the trial court's credibility determination, leads us to conclude that the evidence does not preponderate against the trial court's implied rejection of Select-O-Hits' negligence defense. Accordingly, the trial court did not err by impliedly denying the negligence defense raised by Select-O-Hits.

## Meeting of the Minds

The fourth issue presented for our review is whether the trial court erred by impliedly denying the no meeting of the minds defense raised by Select-O-Hits. Select-O-Hits argues that there were not mutually agreed upon terms between the parties relating to the scope of the work, the cost of the work, and for whom the work was to be performed. It is well established in this jurisdiction that a contract can be expressed, implied, written, or oral, but an enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced. See Johnson v. Central Nat'l Ins. Co., 356 S.W.2d 277, 281 (Tenn. 1962); Price v. Mercury Supply Co., Inc., 682 S.W.2d 924, 933 (Tenn. Ct. App. 1984). An oral contract may be enforced if it can be shown that there was a meeting of the minds, and that both parties have mutually assented to its terms. See Castelli v. Lien, 910 S.W.2d 420, 426 (Tenn. Ct. App. 1995); Computer Shoppe, Inc. v. State, 780 S.W.2d 729, 735 (Tenn. Ct. App. 1989). The contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn. See Batson v. Pleasant View Util. Dist., 592 S.W.2d 578, 582 (Tenn. Ct. App. 1979); Balderacchi v. Ruth, 256 S.W.2d 390, 391 (Tenn. Ct. App. 1952).

Select-O-Hits claims that there was no mutual agreement between the parties as to the scope of the work, the cost of the work, and for whom the work was to be performed. McDonnell Dyer attorneys testified that, at the April 24, 1995, meeting, the Phillips, on behalf of Select-O-Hits, authorized McDonnell Dyer to proceed with the transaction and agreed to pay $120,000.00 in attorney's fees if the deal failed to close. The Phillips admit that they, on behalf of Select-O-Hits, agreed to pay the fees if the transaction failed to close; however, they claim that they were not informed of the amount of the fees until mid May, 1995. McDonnell Dyer attorneys testified that they explained to Select-O-Hits on numerous occasions that McDonnell Dyer represented Select-O-Hits but not the Phillips personally. The Phillips testified that, prior to the July, 1995, conversation between the Phillips and Mr. Harkavy, they thought McDonnell Dyer was representing them personally. The trial court specifically found that "the Phillips knew or should have known that the attorneys were not representing them personally." The trial court in the case at bar was faced with conflicting testimony from McDonnell Dyer and Select-O-Hits. In impliedly rejecting Select-O-Hits' no meeting of the minds defense, the trial court apparently found McDonnell Dyer's witnesses to be more credible than the witnesses Select-O-Hits presented. Our review of the record, taking into account the trial court's credibility determination, leads us to conclude that the evidence does not preponderate against the trial court's implied rejection of Select-O-Hits' no meeting of the minds defense. Accordingly, the trial court did not err by impliedly denying the no meeting of the minds defense raised by Select-O-Hits.

## Quantum Meruit and Unclean Hands

The fifth issue presented for our review is whether the trial court erred by impliedly denying the quantum meruit and unclean hands defenses raised by Select-O-Hits. Select-O-Hits argues that McDonnell Dyer was not entitled to recover under quantum meruit because Select-O-Hits received no benefit from the work performed by McDonnell Dyer. Quantum meruit is an equitable substitute for recovery under a contract. See Castelli v. Lien, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995). Tennessee law permits an attorney to recover fees on the theory of quantum meruit even if the fee contract itself is deemed to be unenforceable. See Cooper & Keys v. Bell, 153 S.W. 844, 846 (Tenn. 1912); Planters' Bank v. Hornberger, 44 Tenn. (4 Cold.) 531, 579 (1867); Cummings v. Patterson, 442 S.W.2d 640, 643 (Tenn. Ct. App. 1968). A party may recover under quantum meruit when the following five circumstances exist:

> (1) there must be no existing, enforceable contract between the parties covering the same subject matter;
> (2) the parties seeking recovery must prove that it provided valuable goods and services;
> (3) the party to be charged must have received the goods and services;
> (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods and services expected to be compensated; and
> (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

Castelli, 910 S.W.2d at 427 (internal citations omitted).

Select-O-Hits claims that it received no benefit from McDonnell Dyer because Mr. Thomas was ultimately unable to sell a single unit of the transaction. We disagree. McDonnell Dyer attorneys and paralegals logged approximately 826 hours of work during its representation of Select-O-Hits. McDonnell Dyer attorneys testified that they performed extensive due diligence and a tremendous amount of tax work for Select-O-Hits. McDonnell Dyer complied with Select-O-Hits' instruction to create the private placement transaction and make the offering available to potential investors. While Select-O-Hits did not incur the benefit of selling the transaction, we find that Select-O-Hits did incur a tangible benefit from McDonnell Dyer which justified a recovery under quantum meruit. Accordingly, the trial court did not err by impliedly denying the quantum meruit defense raised by Select-O-Hits.

Select-O-Hits also argues that the equitable maxim of unclean hands prevents McDonnell Dyer from recovering under quantum meruit. Under the doctrine of unclean hands,

> [H]e who comes into a court of equity, asking its interposition in his behalf, must come with clean hands; and if it appears

from the case made by him or by his adversary that he has himself been guilty of unconscionable, inequitable, or immoral conduct in and about the same matters whereof he complains of his adversary, or if his claim to relief grows out of or depends upon or is inseparably connected with his own prior fraud, he will be repelled at the threshold of the court.

C.F. Simmons Med. Co. v. Mansfield Drug Co., 23 S.W. 165, 168 (Tenn. 1893). This equitable maxim prevents parties from using the courts to enforce agreements "that arise out of unconscionable, immoral or just plain 'crooked' conduct." Farmers & Merchants Bank v. Templeton, 646 S.W.2d 920, 924 (Tenn. Ct. App. 1982). A party who seeks equitable relief must show that his conduct has been fair, equitable, and honest as to the particular controversy connected with the subject matter of the litigation. See 27A AM. JUR. 2D Equity § 126 (1996). Although a finding of fraud or conspiracy on the part of the plaintiff may support the defense of unclean hands, the success of an unclean hands defense is not contingent upon the defendant's successful pursuit of any actionable claim against the plaintiff:

> [O]ne's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character to warrant application of the maxim; any wilful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim. Within the purview of the maxim, the hands of the litigant are rendered unclean by conduct which is "condemned and pronounced wrongful by honest and fair-minded men," inequitable, unfair, dishonest, fraudulent, unconscionable, or in bad faith.

27A AM. JUR. 2D Equity § 129 (1996) (footnotes omitted).

As stated above, we fail to find that McDonnell Dyer acted negligently in its representation of Select-O-Hits. There is certainly no evidence in the record supporting a finding that McDonnell Dyer conducted itself in an unconscionable, inequitable, or immoral manner during the representation of Select-O-Hits. Thus, Select-O-Hits' argument that the equitable maxim of unclean hands prevents a recovery to McDonnell Dyer under quantum meruit is completely without merit. Accordingly, the trial court did not err by impliedly denying the unclean hands defense raised by Select-O-Hits.

**Counterclaim**

-12-

The final issue presented for our review is whether the trial court erred by dismissing the counterclaim brought by Select-O-Hits to recover the $10,000.00 payment made to McDonnell Dyer and the $10,953.05 payment in legal fees made to Mr. Chafetz and the Waring Cox law firm. Select-O-Hits claims that it is entitled to a reimbursement for the $10,000.00 "earnest money" paid to McDonnell Dyer because it erroneously assumed that McDonnell Dyer was acting as Select-O-Hits' attorneys. Select-O-Hits also argues that it is entitled to reimbursement for the $10,953.05 payment in legal fees made to the Waring Cox law firm because it would not have had to hire the law firm had McDonnell Dyer properly represented Select-O-Hits and the Phillips. As previously stated, we agree with the trial court's finding that Select-O-Hits knew or should have known that McDonnell Dyer was not representing the Phillips personally. Additionally, as stated above, we find that McDonnell Dyer properly represented Select-O-Hits. Thus, Select-O-Hits' arguments in support of its counterclaim are without merit. Accordingly, the trial court did not err by dismissing the counterclaim brought by Select-O-Hits.

In the alternative, Select-O-Hits requests this Court to credit Select-O-Hits for the $10,000.00 already paid to McDonnell Dyer against any attorney's fees awarded to McDonnell Dyer. The $10,000.00 already paid to McDonnell Dyer was in the form of a retainer. We find that this amount should be credited to Select-O-Hits against the award of attorney's fees to McDonnell Dyer. Accordingly, Select-O-Hits owes McDonnell Dyer $89,685.00 in attorney's fees minus the $10,000.00 retainer already paid to McDonnell Dyer.

## IV. Conclusion

For the foregoing reasons, the decision of the trial court is affirmed as modified. Costs of this appeal are taxed against the Appellant, Select-O-Hits, Inc., for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE