FILED

10/02/2020

Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### February 11, 2020 Session Heard at Nashville

## DOUGLAS RALPH BEIER v. BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE

**Direct Appeal from the Chancery Court for Hamblen County**
**No. 2018-CV-177          Robert E. Lee Davies, Senior Judge**

———————————————————

### No. E2019-00463-SC-R3-BP

———————————————————

In this appeal from attorney disciplinary proceedings, the hearing panel of the Tennessee Board of Professional Responsibility determined that the attorney's conduct in two cases violated the Rules of Professional Conduct.  In one case, the hearing panel found that the attorney signed the name of a witness on an affidavit, falsely notarized the signature, and did not disclose to the trial court or opposing counsel that he had signed the witness's affidavit.  In another case, the hearing panel found, the attorney persuaded a client in a probate matter to agree to an unreasonable contingency fee arrangement, took advantage of the client's disability, misrepresented to the probate court that the client was the decedent's sole heir, failed to disclose the existence of other heirs, and got the probate court to agree to close the estate without a detailed accounting in order to avoid judicial scrutiny of the unreasonable fee.  The hearing panel suspended the law license of the appellant attorney for two years, with three months served as active suspension and the remainder on probation.  The attorney and the Board both appealed the hearing panel's decision to the chancery court.  The chancery court affirmed the hearing panel's findings as to rule violations and aggravating and mitigating factors, but it modified the sanction to two years active suspension.  The attorney now appeals to this Court, arguing that his conduct was not dishonest, he did not take advantage of a vulnerable client, and his probate fee arrangement was not unreasonable.  We affirm the hearing panel's factual findings and its findings as to rule violations. In view of the seriousness of the violations, we affirm the chancery court's modification of the sanction to two years active suspension.

**Tenn. Sup. Ct. R. 9, § 33.1(d)**
**Judgment of the Chancery Court Affirmed**

HOLLY KIRBY, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

Douglas Ralph Beier, Morristown, Tennessee, Appellant, Pro Se.

Sandy Garrett and Jerry D. Morgan, Brentwood, Tennessee, for the Appellee, Board of Professional Responsibility.

# OPINION
## FACTUAL AND PROCEDURAL BACKGROUND

Respondent-Appellant Douglas Ralph Beier has been licensed to practice law in Tennessee since 1977. He maintains a general law practice in Morristown, in Hamblen County. His practice has always included probate work.

The discipline in this case centers on two matters, which we describe below.

**Affidavit Matter**

The first matter involves the signature on an affidavit. In 2015, Mr. Beier had a client who was a divorced father ("Father"). Father claimed that his daughter ("Daughter"), then five years old, was sexually abused by her teenage sister while both were in the custody of their mother, Father's ex-wife ("Mother"). Mr. Beier prepared to file two petitions on behalf of Father, both making the abuse allegations in support of his request to modify the custody arrangement for Daughter.[1]

Shortly before he was scheduled to leave for a trip out of town, Mr. Beier prepared an affidavit for Father and another affidavit for Daughter's paternal grandmother ("Grandmother"). The affidavits were to be used in court the next Monday. Mr. Beier left both affidavits at his office to be signed while he went to court on another matter.

When Mr. Beier returned to his office later that same day, he saw that Father had signed his affidavit but Grandmother had not signed hers. Mr. Beier signed Grandmother's

---

[1] One petition was to be filed in chancery court, and the other in juvenile court.

- 2 -

name to her affidavit (the "Affidavit"). In his capacity as a notary public, Mr. Beier notarized Grandmother's Affidavit as well.[2] He then left town on his scheduled trip.

When Mr. Beier returned the next Monday, August 31, 2015, he filed the petitions, each with the Affidavit in support. Neither the petitions nor the Affidavit disclosed that Mr. Beier had signed Grandmother's name for her. Based on these filings, the juvenile court entered an order temporarily suspending Mother's parenting time.

Months later, counsel for Mother took Grandmother's deposition. In the course of the deposition, the attorney asked Grandmother whether the signature at the bottom of the Affidavit was hers. Grandmother gave no answer. The attorney repeated the question, more than once, with no response. Finally, Mr. Beier interjected, "That's where I subscribed your signature, right there." Grandmother then agreed, "Uh-huh. Yeah. He subscribed my signature."

In October 2015, Mr. Beier filed a re-verified affidavit making the same statements, signed by Grandmother. In January 2016, counsel for Mother filed a motion alleging misconduct by Mr. Beier with respect to the Affidavit and asking the juvenile court to assess sanctions against Mr. Beier.

In April 2016, Mr. Beier contacted Tennessee's Board of Professional Responsibility (the "Board") to self-report his infraction.

## Estate Matter

The second matter involved Mr. Beier's representation of Ray Norton in connection with an estate.

Mr. Norton contacted Mr. Beier for representation regarding the estate of his deceased aunt, Audrey Jenkins. Mr. Norton, 62 years old, had received Social Security Supplemental Security Income (SSI) benefits and Department of Veterans' Affairs disability benefits (as the child of a veteran) all of his adult life. Mr. Beier understood that Mr. Norton qualified for disability benefits because of a nervous condition.

---

[2] A notary public who "notarizes" a document "attest[s] to the authenticity" of a signature. *Black's Law Dictionary* 1274 (11th ed. 2019). He signs a "jurat," which "typically says 'Subscribed and sworn to before me this day of [month], [year].'" *Black's Law Dictionary* 1015 (11th ed. 2019). By doing so, the notary public "certifies three things: (1) that the person signing the document did so in the [notary public's] presence, (2) that the signer appeared before the [notary public] on the date indicated, and (3) that the [notary public] administered an oath or affirmation to the signer, who swore to or affirmed the contents of the document." *Id*.

- 3 -

Mr. Norton brought a "friend," Paul Barnes, to his initial meeting with Mr. Beier. Mr. Norton explained that Mr. Barnes was the designated payee for some of the disability benefits Mr. Norton received. During the meeting, Mr. Beier proposed that, as compensation for his representation of Mr. Norton as to Ms. Jenkins's estate, Mr. Beier would receive a 33.3% contingency fee of the "gross estate." Mr. Norton agreed to the proposal.

Mr. Norton's deceased aunt, Ms. Jenkins, was a widow without children. She died intestate. She was predeceased by a full-sister and by a half-brother. Mr. Norton was the only child of Ms. Jenkins's full-sister. The half-brother, Sheridan James, had four living children. Mr. Norton told Mr. Beier about these "half-cousins" at their initial meeting.

It appears from the record that Ms. Jenkins owned three parcels of real estate at the time of her death. However, the real property was never part of the Jenkins estate.

In September 2013, Mr. Beier filed a petition on Mr. Norton's behalf, asking the chancery court to name Mr. Norton as Administrator of the Jenkins estate. The petition alleged that Mr. Norton was Ms. Jenkins's sole heir.

Later that same month, the mother of Sheridan James's children saw the Jenkins estate's notice to creditors. She contacted Mr. Beier and told him about her children and their father, Ms. Jenkins's half-brother.

Eleven months later, Mr. Beier filed a petition and proposed order to close the Jenkins estate. In the filing, Mr. Beier asserted that Mr. Norton, "being the sole beneficiary, desires to close the estate without a detailed accounting." Mr. Beier did not notify the James children he had filed this petition. He did not disclose to the chancery court the existence of the James children. Relying on Mr. Beier's representation, the chancery court granted the petition and closed the estate without a detailed accounting.

In calculating his final fee, Mr. Beier included two of the three parcels of real estate Ms. Jenkins owned at the time of her death, even though they were never actually part of the estate.[3] The only work Mr. Beier performed regarding the real property was preparation of an administrator's deed. The total fee Mr. Beier ultimately received for handling the

---

[3] The hearing panel found that Mr. Beier included two parcels in his fee calculation, but his testimony to the hearing panel, reading from his notes, mentions three properties twice: "Charles Lee Drive, . . . two other rentals" and "owned [the] house at Charles E. Drive . . . . owned the property at Roy Potter Road. . . . [a]nother house Roy Potter Road." Mr. Beier's estate calculations list a House #1, House #2, and a Rental.

- 4 -

Jenkins estate was $78,614. Because the estate was closed without a detailed accounting, there was no judicial approval of the fee.

Later, Mr. Norton learned he was not Ms. Jenkins's sole heir, as Mr. Beier had represented to the chancery court; his half-cousins, the James children, were entitled to a portion of the Jenkins estate. Mr. Norton hired new counsel. In February 2016, the new attorney filed a petition on behalf of Mr. Norton to reopen the Jenkins estate.

Mr. Norton's new attorney contacted Mr. Beier about the Jenkins estate. In June 2016, after the Jenkins estate was reopened, Mr. Beier reimbursed the estate his entire fee, with interest.

On October 16, 2016, the Board received a complaint of misconduct regarding Mr. Beier's handling of the Jenkins estate from one of the James children. Mr. Beier self-reported this matter as well.

**Hearing Panel**

In early 2017, the Board filed a petition for discipline against Mr. Beier, citing the Affidavit matter, and then a supplemental petition for discipline, citing the Jenkins estate matter. Both matters proceeded before a hearing panel. After considering testimony and affidavits submitted by both parties, the hearing panel issued findings of fact, finding in pertinent part:

21.     Having heard the testimony of Mr. Beier, [Grandmother], and [Mother's counsel], and considering the demeanor of the witnesses, the inconsistencies in the testimony of Mr. Beier and [Grandmother], and their relationship, along with the other evidence of record, the Panel finds that Mr. Beier's and [Grandmother]'s testimony that [Grandmother] gave Mr. Beier permission to sign her name to the [A]ffidavit and that Mr. Beier did so on August 26, 2015[,] is not credible.

22.     By signing [Grandmother]'s name to the [A]ffidavit without signifying that he was signing her name on her behalf, and by notarizing that signature, Mr. Beier represented to the Juvenile and Chancery Courts that [Grandmother] had in fact signed the [A]ffidavit personally, a representation he knew to be false.
. . . .
39.     Mr. Beier took advantage of Mr. Norton's disability in order to obtain his agreement to the one-third fee.
. . . .

- 5 -

42. Mr. Beier had never previously charged a one-third contingency fee for the probate of an estate.

. . . .

53. Mr. Beier testified that he was unaware of the administration of the estate that Darrell, Kevin, Steven[,] and Lavonda James were heirs of Ms. Jenkins. Mr. Beier's testimony was not credible to the extent that he knew or should have known the James children were also heirs.

. . . .

55. Because Mr. Norton was represented to the court as the only beneficiary of the estate, it was not necessary for Mr. Beier to obtain the court's approval of his one-third fee.

. . . .

58. In determining the value of the gross estate for purposes of computing his one-third fee, Mr. Beier included the estimated value of two pieces of real estate owned by Ms. Jenkins at the time of her death totaling $136,500.

. . . .

60. The only service performed by Mr. Beier in relation to the real estate was the preparation of one administrator's deed.

. . . .

73. At the time of filing the petition, Mr. Beier was either aware that half-siblings had an equal right to inherit as full-siblings, or chose to remain ignorant of that fact by not researching the issue, in order that Mr. Norton would be the only beneficiary of the estate thus allowing Mr. Beier to charge a one-third fee instead of his usual hourly fee.

Thus, in the Affidavit matter, regarding the testimony by Grandmother and Mr. Beier asserting that Grandmother gave Mr. Beier permission to sign her name to the Affidavit, the hearing panel found neither witness credible. The hearing panel also found that, by signing Grandmother's name and notarizing the signature, Mr. Beier represented to the chancery and juvenile courts that Grandmother had signed the document, something he knew to be false.

As to the Jenkins estate matter, the hearing panel found that Mr. Beier took advantage of Mr. Norton's vulnerability to secure an unreasonable contingency fee agreement. It found Mr. Beier's testimony, that he did not inform the chancery court about the James children because he did not realize they might be heirs of Ms. Jenkins, was not credible. By failing to disclose this information to the chancery court, the hearing panel pointed out, Mr. Beier avoided court approval of his fee. It observed that Mr. Beier included two parcels of real property in the "gross estate" for purposes of calculating his fee, even though his work regarding the real property was *de minimis*. Including these two parcels greatly increased the size of his contingency fee.

Based upon these findings, the hearing panel concluded the Board had established several violations of the Rules of Professional Conduct.  In the Affidavit matter, it found violations of the following rules:

RPC 3.3(a)(1) (candor toward the tribunal), "[b]y filing the Affidavit . . . when he signed [Grandmother's] name, by notarizing her purported signature when she did not sign, and by failing to inform the courts that [Grandmother]'s signature was made by himself . . . .";

RPC 8.4(c) (misconduct), "[r]epresenting that the [A]ffidavit had been signed by [Grandmother] was an act of deceit, dishonesty[,] and misrepresentation . . . ."

In the Jenkins estate matter, it found violations of the following:

RPC 1.5(a) (fees), "[b]y charging a one-third fee, and by including the value of the real estate for purposes of computing his fee, Mr. Beier charged [Mr.] Norton, and collected, an unreasonable fee . . . ."

RPC 1.5(a) (fees), the fee agreement between Mr. Beier and Mr. Norton was "insufficiently clear to communicate to Mr. Norton the remittance to him and the method of its determination."

RPC 3.3(a)(1) (candor toward the tribunal), "[b]y stating in the petition that Mr. Norton was Ms. Jenkins' sole heir . . . ."

RPC 3.3(a)(3) (candor toward the tribunal), "[b]y failing to inform the court of the existence of the James descendants . . . ."

RPC 8.4(c) (misconduct), "[b]y taking advantage of Mr. Norton's disability to charge and collect from him an unreasonable fee . . . ."

RPC 8.4(c) (misconduct), "[b]y failing to include the James descendants in the administration of the estate in order to charge and collect from Mr. Norton an unreasonable fee . . . ."

RPC 8.4(a) (misconduct), the "[v]iolation of the aforementioned Rule of Professional Conduct . . . ."[4]

---

[4] An additional alleged violation of RPC 3.3(a)(1) regarding Mr. Beier's response to Mother's counsel's motion for sanctions was voluntarily dismissed.

After finding these violations, the hearing panel looked to the ABA Standards to determine an appropriate type of discipline.[5]  It decided the Standards pointed to suspension as the appropriate discipline.[6]

Turning to the aggravating and mitigating factors, the hearing panel first noted Mr. Beier's "dishonest or selfish motive" as an aggravating factor in filing Grandmother's Affidavit and also in his actions regarding the Jenkins estate.  In the Jenkins estate matter, it determined Mr. Beier was also motivated by his attempt to get an unreasonable fee.  The hearing panel observed that Mr. Beier's misconduct involved multiple offenses.  It found that Mr. Beier refused to acknowledge the wrongful nature of his conduct, citing his continued insistence that the Affidavit was not a false representation, that his fee arrangement with Mr. Norton was reasonable, and that he did not knowingly misrepresent Mr. Norton's status as sole heir.  The hearing panel also deemed Mr. Norton's vulnerability as a victim to be an aggravating factor.  The final aggravating factor was Mr. Beier's substantial experience in the practice of law—over forty years, including time as a juvenile and municipal judge.  The hearing panel found no mitigating factors.[7]

Considering the violations and the aggravating factors, the hearing panel imposed a sanction of a two-year suspension of Mr. Beier's law license, with three months served as active suspension and the remainder on probation.

---

[5] The final sentence of Rule 9, Section 15.4(a), states: "In determining the appropriate type of discipline, the hearing panel shall consider the applicable provisions of the ABA Standards for Imposing Lawyer Sanctions."  Tenn. Sup. Ct. R. 9, § 15.4(a).

[6] The hearing panel cited ABA Standard 6.12, which suggests suspension "when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding."  It also cited ABA Standard 7.2, which suggests suspension "when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system."  The hearing panel also noted ABA Standard 5.13, which suggests reprimand as appropriate "when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."

[7] The hearing panel acknowledged Mr. Beier returned the fee he received from the Jenkins estate and self-reported the allegations of his misconduct, but it declined to find either action to be a mitigating factor because Mr. Beier did both under threat of legal action.

## Chancery Court

The Board appealed the hearing panel's decision to the Hamblen County Chancery Court, arguing disbarment would have been a more appropriate sanction.[8]

The chancery court issued its order on November 28, 2018. It first determined that the hearing panel's factual findings were supported by the evidence. It held that the hearing panel's conclusions regarding Rule violations and application of aggravating and mitigating factors were also supported by the evidence.

Reviewing the discipline imposed by the hearing panel, the chancery court concluded the panel had abused its discretion. It performed a comparative analysis of similar cases and determined it would be more appropriate to make the entire two-year suspension an active suspension, in order to "underscore the seriousness of the violations by Mr. Beier, protect the public from similar misconduct by members of the bar, and preserve the confidence of the public in the integrity and trustworthiness of lawyers in general."

Mr. Beier now appeals to this Court.


## STANDARD OF REVIEW

In exercise of the authority vested in it by the Tennessee Constitution, this Court oversees the practice of law in this State. *See* Tenn. Const. art. II, § 1; Tenn. Const. art. II, § 2; Tenn. Const. art. VI, § 1. As such,

> [t]he Supreme Court of Tennessee is responsible for promulgating and enforcing the rules that govern the legal profession as part of its duty to regulate the practice of law in this state. The Board of Professional Responsibility is one source of authority that addresses and brings forth allegations against attorneys regarding ethical violations, and this Court is ultimately responsible for reviewing its recommendations for attorney discipline.
>
> Once the Board of Professional Responsibility initiates formal disciplinary proceedings against a lawyer, the rules of this Court require that

---

[8] Mr. Beier also appealed, raising issues concerning a procedural deficiency, the hearing panel's conduct, and the inclusion of prior private discipline as aggravating factors. The chancery court found all three issues to be without merit.

he or she has the right to an evidentiary hearing before a panel of three attorneys who determine the appropriate disciplinary action. An attorney may appeal the decision of the hearing panel to the circuit or chancery court[,] and then directly to this Court, where our review is upon the transcript of the record from the trial court, including the record of the evidence presented to the hearing panel.

*Bd. of Prof'l Responsibility v. MacDonald*, 595 S.W.3d 170, 181 (Tenn. 2020) (citations omitted) (internal quotation marks omitted). As we explained:

This Court and the circuit or chancery court apply the same standard of review on appeal. The reviewing court may affirm the hearing panel's decision or, in certain circumstances, "remand the case for further proceedings," but it may only reverse or modify a hearing panel's decision if:

the rights of the party filing the Petition for Review have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

*Id.* (citation omitted) (quoting Tenn. Sup. Ct. R. 9, § 33.1(b)). "Absent these limited circumstances, the hearing panel's decision should not be disturbed on appeal." *Hancock v. Bd. of Prof'l Responsibility*, 447 S.W.3d 844, 850 (Tenn. 2014) (citing *Maddux v. Bd. of Prof'l Responsibility*, 409 S.W.3d 613, 621–22 (Tenn. 2013)). The Court may not "substitute its judgment for that of the hearing panel's as to the weight of the evidence on questions of fact." *Napolitano v. Bd. of Prof'l Responsibility*, 535 S.W.3d 481, 496 (Tenn. 2017) (citing *Long v. Bd. of Prof'l Responsibility*, 435 S.W.3d 174, 178 (Tenn. 2014)).

We recently clarified:

Under Rule 9, a hearing panel is directed to consider the applicable provisions of the ABA Standards to determine the appropriate sanction in a particular case. Tenn. Sup. Ct. R. 9, § 15.4(a). There is no authority under Rule 9 for a hearing panel to base its recommended sanction on a review of sanctions imposed in similar cases. In addition, a trial court's authority to

reverse or modify a hearing panel's decision is limited to the five grounds listed in Section 33.1(b). Inconsistency with sanctions in similar cases is not a listed ground.

*Meehan v. Bd. of Prof'l Responsibility*, 584 S.W.3d 403, 416 (Tenn. 2019). Thus, neither BPR hearing panels nor reviewing trial courts are authorized to base a recommended sanction on a review of sanctions imposed in comparative cases.

Overall, this Court "bear[s] ultimate responsibility for enforcing the rules governing our profession." *Mabry v. Bd. of Prof'l Responsibility*, 458 S.W.3d 900, 903 (Tenn. 2014) (citing *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d 465, 470 (Tenn. 2003)).

## ANALYSIS

On appeal, Mr. Beier states the issues in broad terms, such as whether "the hearing panel's findings, inferences, conclusions, and decisions were made upon unlawful procedures." Under each issue, he offers a fusillade of arguments and sub-issues. We have carefully considered all of them. In the interest of brevity, in this Opinion, we describe in a general way the arguments and sub-issues we find to be without merit on their face, and discuss in more depth the issues that warrant more analysis.

### Improprieties in Prior Proceedings

Mr. Beier asserts first that the chancery court substituted its judgment for that of the hearing panel by making its own findings of fact and conclusions of law beyond those made by the hearing panel. He lists ten statements by the chancery court as examples. We address two of them.[9]

Mr. Beier disputes the chancery court's statement, "Neither Mr. Norton nor his friend, Mr. Barnes, understood the nature of the contingency fee agreement," by arguing the hearing panel did not make such a finding. The hearing panel found expressly that Mr. Norton did not understand the contingency fee agreement. Although it made no express

---

[9] Mr. Beier disputes several trial court statements that have no bearing on the issues at hand. In the Affidavit matter, these include whether Father was Mr. Beier's neighbor and the trial court's description of the petitions to modify the parenting plan. In the Jenkins estate matter, these include whether Mr. Beier knew of the benefits that necessitated having Mr. Barnes as Mr. Norton's payee. Mr. Beier also erroneously asserts that some statements are not supported by the record, such as references to the demand letter from the new attorney for the Jenkins estate. These arguments have no merit.

finding as to Mr. Barnes,[10] this is of no moment.  Mr. Barnes was not Mr. Beier's client, nor is Mr. Beier accused of any ethical violation as to Mr. Barnes.

Mr. Beier also challenges the chancery court's conclusion that "it was completely improper to include the value of the real estate when the title to that real property passed directly to the heirs of Ms. Jenkins by operation of law," arguing the hearing panel did not make this finding.  In concluding Mr. Beier's fee was unreasonable, the hearing panel noted (1) Mr. Beier calculated his fee based in part on the estimated value of real estate owned by Ms. Jenkins; (2) title to the real estate passed by operation of law directly to her heirs upon her death; and (3) the only work Mr. Beier did involving the real estate was preparation of a single administrator's deed.  The chancery court simply connected those dots.  This was no error.

Mr. Beier next contends his prior disciplinary offenses should not have been included in the Board's petition for discipline and its supplemental petition because the discipline imposed was private.  Mr. Beier is mistaken.  We have previously made it clear that such offenses may be considered.  *See Cohn v. Bd. of Prof'l Responsibility*, 151 S.W.3d 473, 487 (Tenn. 2004) (citing *Berke v. Chattanooga Bar Ass'n*, 436 S.W.2d 296, 309 (Tenn. Ct. App. 1968)) ("Although private reprimands are indeed intended to be a matter between the attorney and the Board, 'former misconduct must remain a part of the professional record to be considered as part of the evidence of professional fitness or unfitness.'").  Thus, the Board properly included Mr. Beier's prior offenses in its petition and supplemental petition.

### Evidence of Rule Violations

Mr. Beier argues next that the hearing panel's findings as to rule violations were either not supported by substantial and material evidence or were otherwise arbitrary and capricious.

In "applying the substantial and material evidence test, it is our duty to determine whether the decision is supported by such relevant evidence as a rational mind might accept to support a rational conclusion." *Bd. of Prof'l Responsibility v. Allison*, 284 S.W.3d 316, 322 (Tenn. 2009) (quoting *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316–17 (Tenn. 2007)) (internal quotations omitted).  We look at whether the record contains a "reasonably sound factual basis" for the hearing panel's decision.  *See Hoover v. Bd. of Prof'l Responsibility*, 395 S.W.3d 95, 103 (Tenn. 2012) (quoting *Hughes v. Bd. of Prof'l*

---

[10] However, Mr. Barnes' testimony suggests he did not understand the fee agreement either.

*Responsibility*, 259 S.W.3d 631, 641 (Tenn. 2008)); *Civil Serv. Comm'n*, 216 S.W.3d at 317 (quoting *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 110–11 (Tenn. Ct. App. 1993)). A reasonably sound basis is less than a preponderance of the evidence but "more than a scintilla or glimmer." *Allison*, 284 S.W.3d at 322–23 (quoting *Jones v. Bureau of TennCare*, 94 S.W.3d 495, 501 (Tenn. Ct. App. 2002)).

We look at the evidence in the record as to each ethical violation found by the hearing panel.

### A. Rule of Professional Conduct 1.5

Rule of Professional Conduct 1.5(a) prohibits lawyers from charging unreasonable fees for their services and specifically prohibits them from entering into agreements for unreasonable fees. Tenn. Sup. Ct. R. 8, RPC 1.5(a). RPC 1.5(c) permits contingency fees, but they are subject to the subsection (a) prohibition against unreasonable fees. *See* Tenn. Sup. Ct. R. 8, RPC 1.5(c), cmt. [3]. Fee agreements must state the method by which the fee will be determined. Tenn. Sup. Ct. R. 8, RPC 1.5(c). After representation is concluded, attorneys must provide clients with a written statement "stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination." *Id.*

In the Jenkins estate matter, the hearing panel concluded the contingency fee Mr. Beier charged was unreasonable. It cited the agreement for a one-third contingency fee, as well as inclusion of the value of two parcels of real property in the estate on which the contingency was calculated, even though they were never part of the Jenkins estate.[11] Plus, the only work Mr. Beier performed regarding the real property was preparation of a single administrator's deed. The hearing panel said he collected an overall excessive fee. It also concluded Mr. Beier did not adequately explain to Mr. Norton how his fee would be determined.

Mr. Beier insists the fee was reasonable. He points to Mr. Norton's testimony that he, Mr. Norton, did not know what was in the Jenkins estate, the amount of any debts, or whether the real property had any value beyond the mortgages, claims, and liens. Mr. Beier

---

[11] The parcels of real property passed directly to the heirs by operation of law and were not subject to probate. Tenn. Code Ann. § 31-2-103 (2015) ("The real property of an intestate decedent shall vest immediately upon death of the decedent in the heirs . . . ."); *see also Crook v. Crook*, 345 S.W.2d 679, 680 (Tenn. 1961) ("Now, it is fundamental, as stated in Phillips' Pritchard on Wills, Sec. 31, p. 31, that 'as a rule, neither (an executor or administrator) has control of, or can assume the management of, anything but personal estate, and neither can dispose of real estate, even for the payment of debts, unless that power is conferred by the will, without instituting legal proceedings and obtaining a decree of a court of competent jurisdiction for that purpose.'").

claims he risked getting no fee from the estate at all. He maintains that Mr. Norton understood and assented to their fee agreement, as evidenced by Mr. Norton's signature, and that the ledger sheets told Mr. Norton what would be owed Mr. Beier and why.

As Mr. Beier points out, it is undisputed that Mr. Norton agreed to the fee arrangement in this case. This fact does not absolve Mr. Beier. Regardless of clients' assent, lawyers must refrain from entering into an unreasonable fee agreement in the first place. "A lawyer *shall not make an agreement for . . .* an unreasonable fee or an unreasonable amount for expenses." Tenn. Sup. Ct. R. 8, RPC 1.5(a) (emphasis added).[12]

The record in this case contains substantial and material evidence to support the hearing panel's conclusion that the fee arrangement between Mr. Beier and Mr. Norton was unreasonable. The agreement provided for Mr. Beier's representation in the Jenkins estate in exchange for "33.3% of [the] gross estate." Mr. Beier said he had never before charged a contingency fee in a probate case. In the initial telephone call between Mr. Beier and Mr. Norton, as well as in their first meeting, Mr. Norton told Mr. Beier that Ms. Jenkins had owned about three different parcels of real property. Reviewing his notes, Mr. Beier conceded he "may" have called the Tax Assessor's office to ascertain the value of those properties. This supports the hearing panel's finding that, during his initial meeting with Mr. Norton, Mr. Beier learned of several parcels of property associated with the estate and the assessed values of those properties. As noted by the chancery court, Mr. Beier easily could have determined whether any of the properties had liens. Ultimately, all of this information should have caused him to realize that a fee arrangement for one-third of the gross estate would generate a fee that far exceeded the typical probate fee for a similar estate in that area.

---

[12] As quoted by this Court in *White v McBride*:

> The fact that an attorney fully informs his client of the contingent fee contract and its implications does not validate it. The court in *Florida Bar v. Moriber*, 314 So.2d 145, 149 (Fla. 1975), faced a similar defense and stated "even if we presume that the client were an educated, experienced party dealing at arm's length with Respondent, it is our view that an attorney may still be disciplined for overreaching when fees charged are grossly disproportionate to the services rendered." In the instant case even if Mr. White fully explained the contingent fee contract to Mr. McGrory, it does not validate the agreement in this case. It is quite possible that Mr. McGrory did not fully understand the matter and had no idea what other attorneys in the area would charge for similar services to obtain his legal share of his wife's estate, which he would have received by operation of law. The duty must therefore be placed on the attorney to deal fairly and in good faith with his clients in setting fees.

937 S.W.2d 796, 799 (Tenn. 1996) (quoting the trial court ruling).

- 14 -

Mr. Beier's arguments hearken to those made, and rejected, in *White v. McBride*, 937 S.W.2d 796 (Tenn. 1996). In *White*, as in this case, the attorney entered into a one-third contingency fee arrangement to probate an estate. *Id.* at 797. The trial court held the fee arrangement violated the predecessor to RPC 1.5 as an unreasonable fee, in that it was "grossly disproportionate to the services he rendered." *Id.* at 799. The attorney argued the fee was not unreasonable because, at the time he entered into the contingency-fee contract, "he had no idea as to the size" of the estate at issue. *Id.* at 800. This Court rejected that argument, finding the evidence showed the attorney had information available showing that the estate was sizeable, so uncertainty as to "the exact value of [the] estate" did "not justify the one-third percentage." *Id.* at 801. The *White* Court also noted that, "[a]lthough this estate matter was not without problems, it was, in the scheme of things, not terribly complicated or novel," and did not warrant a fee "grossly in excess" of the fee customarily charged in that area for an estate of that size. *Id.* The same can be said in this case.

Mr. Beier maintains he adequately informed Mr. Norton about how his fee would be calculated, relying in part on ledger sheets provided to Mr. Norton. Mr. Beier describes the ledger sheets as a "multipage accounting" that "sets out assets received, creditors paid, 2/3 of the assets to [Mr. Norton] and 1/3 to [Mr.] Beier[,] totals the assets and itemizes every payment[, and] sets out the funds received in the Bank account and itemizes every check." He asserts the ledger sheets "show[] the cash received and the money to be paid."

The hearing panel reviewed the collection of handwritten ledger sheets prepared by Mr. Beier "to keep [Mr. Norton] abreast of the status of his funds, of the value of his assets, [and] the distributions" and concluded they were unsuitable to communicate to Mr. Norton what he would pay and how that amount would be calculated. We agree. From our review, the ledger sheets more closely resemble personal notes than any sort of clarifying communication.

Overall, the comments of this Court in *White v. McBride* are applicable to Mr. Beier's fee arrangement with Mr. Norton. The record contains substantial and material evidence supporting the hearing panel's conclusion that "the fee sought to be charged was clearly excessive." *Id.*

### B.       *Rule of Professional Conduct 3.3*

In relevant part, Rule of Professional Conduct 3.3 states:

> (a) A lawyer shall not knowingly:

> (1) make a false statement of fact or law to a tribunal; or
>        . . .

(3) in an ex parte proceeding, fail to inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

Tenn. Sup. Ct. R. 8, RPC 3.3(a).

The hearing panel in this case concluded Mr. Beier violated Rule 3.3(a)(1) in the Affidavit matter and also in the Jenkins estate matter. In the Affidavit matter, it found Mr. Beier knowingly made false statements of fact when he signed Grandmother's name to the Affidavit and filed it without disclosing he had done so. In the Jenkins estate matter, it found Mr. Beier knowingly made a false statement of fact and law by telling the probate court that Mr. Norton was Ms. Jenkins's sole heir. Also in the Jenkins estate matter, the hearing panel concluded Mr. Beier violated Rule 3.3(a)(3) by failing to inform the probate court about Mr. Norton's half-cousins. We address the findings in the Affidavit matter first, and then the findings in the Jenkins estate matter.

As to the Affidavit matter, Mr. Beier argues the hearing panel ignored the fact that the information in the Affidavit was true. He characterizes as "uncontradicted" his assertion that he signed the Affidavit with Grandmother's permission.

Mr. Beier's argument that the statements in the Affidavit were true is beside the point. The falsity was in Mr. Beier's representation to the trial court that Grandmother had signed the Affidavit and thus had sworn to the statements it contained. By notarizing the signature on the Affidavit, Mr. Beier falsely affirmed that he had witnessed Grandmother sign the Affidavit. As cited by the hearing panel, "A notary's acknowledgment says to the world that the execution of the instrument was carried out according to law." *Beazley v. Turgeon*, 772 S.W.2d 53, 59 (Tenn. Ct. App. 1988).

From our review of the evidence, Mr. Beier's assertion that it was "uncontradicted" that he had Grandmother's permission to sign her name to the Affidavit is, well, contradicted. Indeed, the statements made by both Grandmother and Mr. Beier were so inconsistent they led the hearing panel to determine that neither was a credible witness.

Well after the Affidavit with Mr. Beier's signature was filed, and after the parenting arrangement was modified based in part on the Affidavit, Mother's attorney took Grandmother's deposition. The attorney asked Grandmother *three times* who signed the Affidavit.[13] She did not respond to the question until Mr. Beier interjected that he had

---

[13] The following is the relevant excerpt from Grandmother's deposition:

- 16 -

"subscribed" her signature. Grandmother then parroted Mr. Beier's response. The attorney who took the deposition testified that Grandmother "wasn't answering the question. I asked her . . . . And she stared at [the Affidavit] and stared at it and stared at it. I've practiced law nine years[;] that was the longest pause I'd ever experienced in a deposition. By far. Nothing came close."

During that same deposition, Grandmother said she and Father were traveling to Knoxville to take Daughter to see Dr. Diana McCoy when Mr. Beier asked them to come in and sign their affidavits. Father went in to sign his affidavit but, Grandmother explained, she did not because Daughter "was asleep in the car so [Mr. Beier] asked me if he could sign my name and I said, yes. So that's the reason I did not go in." The Affidavit indicates on its face that Mr. Beier signed and notarized it on August 26, 2015; Mr. Beier affirmed the date in his testimony. Dr. McCoy's affidavit says she met with Father that day, but it says she did not meet with Daughter until the following day, August 27, 2015.

In her testimony to the hearing panel, Grandmother said she went with Father to Knoxville, for his first visit with Dr. McCoy, after Father went by Mr. Beier's office to sign his affidavit. In contrast to her deposition testimony, Grandmother told the hearing panel she did not sign her affidavit because she had "just forgotten" about it. During the Knoxville trip, according to Grandmother's hearing panel testimony, Mr. Beier contacted them and she gave him permission to sign the Affidavit.

---

Q. . . . is that your signature at the bottom of the [Affidavit]? Not at the very bottom but toward the bottom?

[Grandmother], is that your signature at the bottom of the document? I'm going to ask you one more time for the record and please respond to my question. Is that your signature at the bottom of the document?

MR. BEIER: That's where I subscribed your signature, right there.

A. Uh-huh. Yeah. He subscribed my signature.

Q. My question is, is this your signature toward the bottom of . . [.] Don't speak, Mr. Lawyer. Above where it says [Grandmother] there's a blank and then there's a signature that says "[Grandmother's name,]"[] is that your signature?

A. He subscribed my signature.

Q. [Grandmother], this is not a hard question. Is that . . [.]

A, No. That is not my . . [.] No. That is not my signature.

Contradicting both versions of Grandmother's testimony, Mr. Beier testified to the hearing panel that he called Grandmother and told her she needed to come to his office and sign the Affidavit because he was about to leave town. According to Mr. Beier, Grandmother said health problems prevented her from coming to his office so she asked Mr. Beier to sign for her instead.

Even apart from the numerous contradictions, none of this evidence explains Mr. Beier's decision not to inform the trial court in the parenting proceeding that he had signed Grandmother's name to the Affidavit and had notarized the signature as Grandmother's signature. Taken together, this amounts to substantial and material evidence to support the hearing panel's conclusion that Mr. Beier knowingly made false statements in violation of Rule 3.3(a)(1).

As to the Jenkins estate matter, Mr. Beier argues he did not "knowingly" or "intentionally" mislead the probate court by failing to disclose Mr. Norton's cousins. Instead, out of negligent ignorance of the law, he mistakenly did not equate the inheritance rights of half-siblings with those of full siblings.[14]

The hearing panel determined that Mr. Beier acted knowingly when he initially claimed Mr. Norton was the sole heir, when he failed to correct himself after the mother of Mr. Norton's cousins contacted him, and when he failed to inform the probate court of those cousins. Mr. Beier has practiced law since 1977; he has done probate work ever since he began. He said he "probably open[s] two estates a month." Tennessee Code Annotated § 31-2-107, titled "Relatives of the half blood," is concise and clear: "Relatives of the half blood inherit the same share they would inherit if they were of the whole blood."

Despite this, Mr. Beier maintains he was unaware of section 31-2-107 and his research only led him to Tennessee Code Annotated § 31-2-104, on intestate succession for an estate.[15] Put simply, the hearing panel did not believe Mr. Beier's claim of

---

[14] In support, Mr. Beier cites *Office of Disciplinary Counsel v. McKinney*, 668 S.W.2d 293 (Tenn. 1984), for the proposition that malpractice is not an appropriate basis for disciplinary proceedings. Respectfully, Mr. Beier overstates the holding in *McKinney* and overlooks the fact that *McKinney* is distinguishable because there was no evidence of intentional misconduct. In *McKinney*, the Court found that the trial court had placed undue weight on a malpractice jury verdict against the attorney. *McKinney*, 668 S.W.2d at 298. The Court held that "the record supports the conclusions reached by the Hearing Panel that McKinney was 'grossly negligent in regard to those matters . . . [but did not commit] intentional misconduct.'" *McKinney*, 668 S.W.2d at 299. The *McKinney* Court reversed the trial court's punishment; the Court reinstated the panel's imposition of a public censure. *Id.*; *see also Sneed v. Bd. of Prof'l Responsibility*, 37 S.W.3d 886, 891 (Tenn. 2000) (concluding that the Board had the authority to discipline attorneys for negligent conduct).

[15] This statute sets forth intestate succession for an estate. *See* Tenn. Code Ann. § 31-2-104.

ignorance. There is ample evidence to support this conclusion. In his deposition prior to the hearing, Mr. Beier indicated he learned on September 16, 2013, during his first meeting with Mr. Norton, that Ms. Jenkins had a deceased half-brother whose children were alive. Mr. Beier filed the petition asking the court to appoint Mr. Norton as administrator of the Jenkins estate—in which he professed Mr. Norton was his aunt's sole heir—two days later. During his testimony to the hearing panel, Mr. Beier equivocated that he was "not exactly sure" when he learned of Mr. Norton's half-cousins. Regardless, it is undisputed that Mr. Beier was told about the half-cousins a week later, when he received a telephone call from their mother, Nancy James. Eleven months later, still acting ex parte, Mr. Beier asked the court to close the Jenkins estate, with no detailed accounting, based on his assertion that Mr. Norton was the sole heir. The court closed the estate on that basis.

At no point did Mr. Beier inform the probate court of the existence of the James descendants. The omission of this information paved the way for Mr. Beier to collect an outsized fee without court oversight.

We find substantial and material evidence in the record to support the hearing panel's conclusion that Mr. Beier made a false statement to the probate court during ex parte proceedings, in violation of RPC 3.3(a)(1) and (3).

### C. Rule of Professional Conduct 8.4

We next address the violations of Rule 8.4. In pertinent part, it provides:

It is professional misconduct for a lawyer to:

> (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; [or]
> . . .
> (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation . . . .

Tenn. Sup. Ct. R. 8, RPC 8.4. The hearing panel found Mr. Beier separately violated Rule 8.4(c) by representing that Grandmother had signed the Affidavit,[16] by taking advantage of Mr. Norton's disability to collect an unreasonable fee, and by failing to include the James descendants as heirs to Ms. Jenkins's estate in order to collect his unreasonable fee. The

---

[16] Mr. Beier contests the hearing panel's conclusion that his misconduct in the Affidavit matter also violated RPC 8.4(a) and (c). His arguments essentially repeat those we have already addressed above.

- 19 -

hearing panel concluded that each violation also constituted professional misconduct under Rule 8.4(a).

As to this violation in the Jenkins estate matter, Mr. Beier argues the record is bereft of any proof supporting the Board's allegations that Mr. Norton suffered from "low cognitive functioning," "severe anxiety disorder," "diminished mental capacity," and was otherwise "not capable of understanding."[17]  Mr. Beier takes issue with the hearing panel's conclusion that he took advantage of Mr. Norton.

The hearing panel found:

29.    Mr. Norton, age 62 years, has received Social Security Supplemental Income (SSI) benefits from the Department of Veteran Affairs as the "helpless child of a veteran"[18] all his adult life as the result of his "nerves." For his SSI benefits, the Social Security Administration required that he have a representative payee.  Mr. Beier knew of Mr. Norton's disability.

30.    At the time of Ms. Jenkins' death, and the probate of her estate, Paul Barnes was Mr. Norton's representative payee.

31.    Mr. Barnes described Mr. Norton has a "trusting man" who needed someone to help him with his affairs.

32.    On September 16, 2013, Mr. Norton and Mr. Barnes met with Mr. Beier concerning Mr. Beier's possible representation of Mr. Norton in the probate of Ms. Jenkins' estate.
. . . .

39.    Mr. Beier took advantage of Mr. Norton's disability in order to obtain his agreement to the one-third fee.

---

[17] Mr. Beier also reiterates that Mr. Norton signed the documents on his contingency fee and thus agreed to the fee.  We have already addressed that argument above.  We note that Mr. Beier concedes that he was not accused of violating RPC 1.14, which sets forth attorneys' responsibilities concerning clients with diminished mental capacity.  *See* Tenn. Sup. Ct. R. 8, RPC 1.14.  Thus, it was not necessary for the hearing panel to find that Mr. Norton has diminished capacity.

[18] The hearing panel explained here, citing 38 U.S.C. §§ 101(4)(A), 1542 and 38 C.F.R. 3.356, that "Children of veterans of a period of war may receive compensation from the VA, and that compensation may continue into adulthood if the child is 'permanently incapable of self-support' prior to age 18."

The hearing panel's findings are well supported in the record. As discussed above, there is substantial and material evidence in the record to support the hearing panel's finding that Mr. Beier did not sufficiently communicate to Mr. Norton how his fee would be determined and that Mr. Norton did not understand the arrangement to which he had agreed. The record also supports the hearing panel's finding that Mr. Beier exploited Mr. Norton's disability. The evidence showed that Mr. Norton receives government benefits because of his disability and that Mr. Barnes, who accompanied Mr. Norton to meet with Mr. Beier, is the designated payee for them. Discussing his disability, Mr. Norton testified: "Well, one, I have problems remembering things, and then not only that, I've had bad problems with my nerves about all my life." Mr. Barnes described Mr. Norton as a trusting man who needs help with his affairs. In his testimony, Mr. Beier admitted he was made aware during his first meeting with Mr. Norton and Mr. Barnes that Mr. Norton needed a payee to receive benefits related to a nervous condition. Considered together, all of this constitutes substantial and material evidence to support the hearing panel's conclusions as to violations of Rule 8.4(a) and (c) in the Jenkins estate matter.

Mr. Beier protests the hearing panel's finding that the same conduct subject to the rule violations discussed above also violated Rule 8.4. He contends this finding amounts to repeat charges levied in order to justify enhanced punishment. He asserts this practice contributes to inconsistent discipline of attorneys.

We make short work of this argument. To be sure, there is some overlap in the ethics rules. Knowing false statements to a tribunal that violate RPC 3.3(a)(1) may also constitute "conduct involving dishonesty, fraud, deceit, or misrepresentation" under RPC 8.4(c). Rather than revealing flaws in the ethics rules or disciplinary practices, this reflects the seriousness of the misconduct. There is no overreach in finding that Mr. Beier's conduct violated more than one rule.

## Propriety of the Sanction Imposed

Mr. Beier argues that the sanction imposed should be, at most, public censure. The Board asks the Court to affirm the discipline imposed by the chancery court, a two-year active suspension.

Having concluded that the hearing panel properly determined Mr. Beier violated Rules 1.5, 3.3, and 8.4, to evaluate whether the discipline is appropriate, we first consider whether the hearing panel applied the appropriate ABA Standards for Imposing Lawyer Sanctions in identifying a baseline sanction for Mr. Beier's conduct. After that, we look at the aggravating and mitigating factors in this case. Then we consider the sanction and comparative cases.

## A.  ABA Standards for Baseline Sanction

The hearing panel found that the appropriate ABA standards for consideration were 5.13 (reprimand), 6.12 (suspension), and 7.2 (suspension).  It determined that Mr. Beier's license to practice law should be "suspended for a period of two (2) years pursuant to Tennessee Supreme Court Rule 9, § 12.2.  Pursuant to Rule 9, § 14.1, all but three (3) months of the suspension are deferred with Mr. Beier to be subject to probation for the remainder of his suspension."  The chancery court, however, concluded that the baseline sanction should be disbarment pursuant to ABA Standard 7.1.

For Mr. Beier's violations arising out of the Affidavit matter, we agree with the hearing panel that ABA Standards 5.13,[19] 6.12,[20] and 7.2[21] are applicable.  While Mr. Beier's actions amounted to dishonesty, there was no apparent motive of personal profit.  But the rule violations arising out of the Jenkins estate are another matter.  As to those more serious violations, we agree with the chancery court that, under ABA Standard 7.1, disbarment must also be considered as an appropriate baseline sanction. Standard 7.1 provides:

> Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.

Standards for Imposing Lawyer Sanctions § 7.1.  We agree that, based on the rule violations committed, all of the above ABA Standards are applicable.  Therefore, before consideration of any aggravating or mitigating factors, the ABA Standards establish a baseline sanction of suspension or even possibly disbarment.

## B.  Aggravating and Mitigating Factors

---

[19] "Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."  Standards for Imposing Lawyer Sanctions § 5.13.

[20] "Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding."  Standards for Imposing Lawyer Sanctions § 6.12.

[21] "Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system."  Standards for Imposing Lawyer Sanctions § 7.2.

Mr. Beier next objects that the hearing panel's conclusions regarding aggravating and mitigating factors are arbitrary and capricious. The hearing panel found applicable the following aggravating factors: (1) dishonest or selfish motive, (2) multiple offenses, (3) refusal to acknowledge wrongful nature of conduct (4) vulnerability of victim, and (5) substantial experience in the practice of law. It found no mitigating factors applicable.

First, we consider the aggravating factors. Mr. Beier says there is "no argument" to support a finding of dishonest or selfish motive as to the Affidavit matter, and reprises his earlier arguments that the fee in the Jenkins estate matter was neither selfish nor dishonest. We disagree. We have already held there is substantial and material evidence to support the hearing panel's finding that Mr. Beier made a false statement by signing Grandmother's name to the Affidavit, notarizing the signature, and filing the Affidavit without disclosing that he signed it. We have also held that there is substantial and material evidence to support the hearing panel's finding that Mr. Beier (1) exploited Mr. Norton's disability; (2) misrepresented to the probate court that Mr. Norton was Ms. Jenkins's sole heir; and (3) refrained from disclosing Mr. Norton's half-cousins to the probate court, all in order to facilitate his receipt of an unreasonable fee without court oversight. This evidence fully supports application of the "dishonest or selfish motive" aggravating factor.

Next, Mr. Beier argues that the hearing panel misapplied the multiple offenses aggravating factor. Citing *Board of Professional Responsibility v. Daniel*, 549 S.W.3d 90 (Tenn. 2018), he argues that this aggravating factor "is generally understood to mean same or similar offenses as a pattern of conduct" and it is inapplicable here because his violations were separate and isolated.

As pointed out in *Daniel*, courts have at times conflated "multiple offenses" with "a pattern of misconduct." *Id*. at 103 n.11 (acknowledging a "lack of precision" in analyzing "multiple offenses" versus "pattern of misconduct"). It appears Mr. Beier does the same. The hearing panel in this case specifically concluded that the record *did not* support a conclusion that Mr. Beier engaged in a pattern of misconduct. Rather, it found that the "multiple offenses" factor applied because Mr. Beier committed more than one violation of the rules. We see no error in applying this aggravating factor.

Mr. Beier contends that the hearing panel erred in applying the aggravating factor that he refuses to acknowledge the wrongful nature of his conduct. He again cites *Daniel* for the proposition that "the mounting of a defense, without more, should not be applied as an aggravating factor." *Id*. at 104.

In applying this aggravating factor, the hearing panel emphasized that Mr. Beier refuses to acknowledge that signing Grandmother's name to the Affidavit, notarizing the signature, and filing it without disclosing his actions amounts to a false representation to

the court. It also noted that Mr. Beier refused to acknowledge that his assertion to the probate court that Mr. Norton was Ms. Jenkins's sole heir was false, that the contingency fee agreement for the Jenkins estate was unreasonable, or that his fee in that matter was exorbitant. Mr. Beier continues these positions in this appeal. Attorneys often offer defenses while also acknowledging their conduct was wrong. Mr. Beier does not. In this case, much of Mr. Beier's defense is essentially insistence that his conduct was not wrong. Under these circumstances, we find no error in the hearing panel's application of the aggravating factor that he refuses to acknowledge the wrongful nature of his conduct.

Mr. Beier next disputes the hearing panel's conclusion that Mr. Norton was a vulnerable victim. In making this determination, there need not be a finding that the victim has diminished capacity; rather, the hearing panel may look at the victim's overall circumstances. *See, e.g., Maddux v. Bd. of Prof'l Responsibility*, 288 S.W.3d 340, 349 (Tenn. 2009) (elderly couple with one spouse suffering from a physical handicap constituted vulnerable victims). The same substantial and material evidence supporting the hearing panel's finding that Mr. Beier took advantage of Mr. Norton's disability also supports its decision to apply the aggravating factor regarding the vulnerability of the victim. We find no error in the hearing panel's application of this factor.

Finally, Mr. Beier challenges the consideration of his substantial experience in the practice of law as an aggravating factor rather than a mitigating factor because, he says, he maintained "40 years of practice without any significant disciplinary actions." Respectfully, absence of a disciplinary record is a separate consideration. This aggravating factor underscores that, with his years of experience, Mr. Beier should have known better. *See Skouteris v. Bd. of Prof'l Responsibility*, 430 S.W.3d 359, 371 (Tenn. 2014) ("Mr. Skouteris also argues that his punishment should be reduced in light of his twenty-four-year law career. Under the ABA Standards, however, substantial experience in the practice of law is an aggravating factor, not a mitigating factor. ABA Standard 9.22(i).").

Mr. Beier also argues that the hearing panel erred by concluding there were no mitigating factors in this case. He contends that the hearing panel ignored (1) his self-reports, (2) his complete restitution of fee in the Jenkins estate matter, (3) the fact that no harm occurred in either case, (4) his full cooperation with the investigation, (5) his lack of significant prior disciplinary action, and (6) the fact that the violations were isolated instances of misconduct.

The hearing panel specifically addressed Mr. Beier's first two arguments, pointing out that his self-reports and restitution were not mitigating factors because (1) Mr. Beier reported his misconduct only under the threat of report by other counsel, and (2) he only returned his fee in the Jenkins estate matter after Mr. Norton's new attorney demanded that he do so. *See* Standards for Imposing Lawyer Sanctions, § 9.4(a) (amended 1992) (listing

"forced or compelled restitution" under "Factors which are neither aggravating nor mitigating"). We agree.

As for lack of harm, in the Jenkins estate matter, harm was averted only because Mr. Beier's misconduct was caught in time to reopen the estate and avoid disinheritance of the rest of Ms. Jenkins's heirs. We also agree with the hearing panel that Mr. Beier cannot be said to have fully cooperated with the investigation when his testimony was deemed not credible and to this day he has not acknowledged the wrongfulness of his conduct.

We agree with Mr. Beier that, under the ABA Standards, the absence of a prior disciplinary record is a mitigating factor. *See* Standards for Imposing Laywer Sanctions, § 9.32(a). Unfortunately, Mr. Beier has a prior disciplinary record. The fact that his prior disciplinary actions were private doesn't mean they don't exist. In addition, the fact that there was not a pattern of misconduct is not a mitigating factor, it is only a reason not to apply the "pattern of misconduct" aggravating factor. *See* Standards for Imposing Lawyer Sanctions, § 9.22(c).

In sum, the hearing panel's findings as to Mr. Beier's violations of the Rules of Professional Conduct and its application of the pertinent aggravating and mitigating factors are supported by substantial and material evidence in light of the entire record.

## C. Propriety of Sanction and Uniformity Analysis

As outlined above, the hearing panel imposed a two-year suspension with all but three months deferred, subject to probation. This discipline was based on ABA Standards that did not include disbarment as an appropriate baseline sanction. After finding that ABA Standard 7.1 on disbarment was an appropriate baseline sanction, the chancery court found the hearing panel had abused its discretion in imposing only three months' active suspension, and went on to impose a two-year active suspension.[22]

A hearing panel abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *Bd. of Prof'l Responsibility v. MacDonald*, 595 S.W.3d 170,

---

[22] The chancery court stated in its Conclusion:

[G]iven the aggravating factors of dishonest or selfish motive, of multiple offenses, of his refusal to acknowledge the wrongful nature of his conduct, of his taking advantage of Mr. Norton, and his over forty years of experience, with no mitigating factors, the Court finds the Panel's imposition of suspension for two years, with all but three months deferred, amounts to abuse of discretion.

182 (Tenn. 2020) (quoting *Sallee v. Bd. of Prof'l Responsibility*, 469 S.W.3d 18, 42 (Tenn. 2015)) (alterations in original omitted). As noted above, we agree with the chancery court that ABA Standard 7.1 on disbarment is applicable. The hearing panel failed to consider disbarment as an applicable baseline sanction. Under these circumstances, we agree with the chancery court that the hearing panel abused its discretion. Given that the ABA Standards established a baseline sanction of either suspension or disbarment, the above aggravating factors and the absence of any mitigating factors point to a substantial suspension, one that exceeds three months active suspension. We agree with the chancery court's observation that a more substantial sanction is needed in order to "underscore the seriousness of the violations by Mr. Beier, protect the public from similar misconduct by members of the bar, and preserve the confidence of the public in the integrity and trustworthiness of lawyers in general."[23] Specifically, we agree with both the chancery court and the Board that, under the circumstances of this case, a two-year suspension to be served fully on active suspension is the appropriate sanction.

In arguing for a two-year suspension, the Board compares Mr. Beier's conduct to the violations in *Board of Professional Responsibility v. Justice*, 577 S.W.3d 908 (Tenn. 2019). In *Justice*, we affirmed the sanction of disbarment where the attorney violated RPC 1.5(a), 3.4(b), 8.4(a), and 8.4(c)—and twice violated RPC 3.3(a)(1). *Id.* at 921–22, 933. In that case, six aggravating factors and two mitigating factors were found applicable. *Id.* at 922. Despite the sanction handed down in *Justice*, however, the Board asks the Court to affirm the chancery court's imposition of a two-year active suspension.

We agree. From our review of prior cases, disbarment is typically reserved for cases that involve a pattern of misconduct or even more serious rule violations than those committed by Mr. Beier. For example, in *Skouteris*, the attorney effectively converted the funds of six clients and demonstrated a troubling pattern of misconduct *prior* to those violations. *Skouteris*, 430 S.W.3d at 362–66, 367 n.4. In *Meehan*, we reinstated the hearing panel's initial decision to disbar an attorney convicted of bank fraud. *Meehan*, 584 S.W.3d at 414, 418. In *Hoover*, the attorney knowingly failed to perform services for his

---

[23] The chancery court based its conclusion on the appropriate sanction in part on a comparative analysis, that is, a review of similar cases to determine the appropriate sanction. As noted above, this Court recently held that, while hearing panels and trial courts must consider the applicable provisions of the ABA Standards to determine the appropriate sanction in a particular case, "[t]here is no authority under Rule 9 for a hearing panel to base its recommended sanction on a review of sanctions imposed in similar cases." *Meehan*, 584 S.W.3d at 416 (citing Tenn. Sup. Ct. R. 9, § 15.4(a)). Moreover, "a trial court's authority to reverse or modify a hearing panel's decision is limited to the five grounds listed in Section 33.1(b). Inconsistency with sanctions in similar cases is not a listed ground." *Id.* Thus, reviewing trial courts are not authorized to base a recommended sanction on a review of sanctions imposed in comparative cases. Our opinion in *Meehan*, however, was issued after the chancery court's decision in this case, so the chancery court could not have been aware of it when the ruling was made.

clients and violated his professional duties on multiple occasions. The numerous aggravating factors included substantial experience practicing law, multiple offenses, a pattern of misconduct, failure to acknowledge wrongdoing, and incompetence. *Hoover*, 395 S.W.3d at 107. Even in *Justice*, despite the similarity of the attorney's offenses and aggravating factors to Mr. Beier's situation, the attorney demonstrated a pattern of misconduct. *Justice*, 577 S.W.3d at 932.

We agree with the chancery court's observation that this case may fairly be compared to *Milligan v. Board of Professional Responsibility*, 166 S.W.3d 665, 674 (Tenn. 2005), and *Napolitano v. Board of Professional Responsibility*, 535 S.W.3d 481 (Tenn. 2017). In *Milligan*, the attorney settled a case without the client's authority; forged signatures on the settlement check and the release document; got an employee to falsely notarize, after the fact, the forged signatures; deposited all of the settlement funds into his personal account; and procured false affidavits to conceal his misconduct. *Milligan*, 166 S.W.3d at 669. The Court imposed a two-year suspension from the practice of law. *Id*. at 674. In *Napolitano*, the Court affirmed a five-year suspension for an attorney who had previously served a five-year suspension, lied under oath, and committed misconduct involving a client's property. *Napolitano*, 535 S.W.3d at 484–87.

In this case, in the Affidavit matter, Mr. Beier signed Grandmother's name, falsely notarized the signature, and neither he nor Grandmother offered credible testimony on how the signature came about. The Jenkins estate matter did not include actual misappropriation of client funds, as in *Milligan*. However, the circumstances under which Mr. Beier obtained an unreasonable fee are equivalent. To obtain the extravagant fee, Mr. Beier took advantage of Mr. Norton as a vulnerable victim, misrepresented to the probate court that Mr. Norton was Ms. Jenkins's sole heir, failed to disclose to the court the existence of the other heirs, and then persuaded the probate court to close the estate without a detailed accounting in order to avoid judicial scrutiny of the fee. We agree with the hearing panel that there are no mitigating factors and several aggravating factors, including dishonest or selfish motive, multiple offenses, a vulnerable victim, and over 40 years' experience in the practice of law. On top of that, Mr. Beier refuses to acknowledge the wrongfulness of his conduct.

For all of these reasons, we agree with the Board and affirm the chancery court's decision to impose a two-year suspension, all to be served as active suspension.

## CONCLUSION

Accordingly, based on the severity of Mr. Beier's violations, the applicable aggravating circumstances, the relevant caselaw, and the entire record, we conclude that a two-year suspension from the practice of law, all to be served as active suspension, is appropriate.  It is further ordered that Mr. Beier shall comply in all respects with Tennessee Supreme Court Rule 9, specifically with regard to the obligations and responsibilities of suspended attorneys.  Costs of this appeal are taxed to Mr. Beier, for which execution may issue if necessary.

_____
HOLLY KIRBY, JUSTICE